WM 17-353 PO
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LUIS UZHCA and MARIA SMITH,

                        Plaintiffs,

    -against-

WAL-MART STORES, INC. SAM'S EAST, INC. and
INLAND-GREENBURGH DELAWARE BUSINESS
TRUST,

                        Defendants.
------------------------------------------------------------------------X

Docket No.: **17CV038350**

**DEFENDANTS'
RESPONSE TO
PLAINTIFF'S RULE 56.1
STATEMENT**

        **Movant/defendant, WAL-MART STORES EAST, LP, as and for its "Response to Plaintiffs' Rule 56.1 Statement" respectfully argues that plaintiffs' Rule 56.1 statement fails to comply with the requirements of 56.1(b) in that plaintiffs' additional 41 paragraphs, which are more than the moving party's original 35 paragraphs, are not "short and concise,"[1] do not contain "material" facts, and do not raise a "genuine issue to tried." Defendants have parsed this bloated 56.1 statement for any facts that are (1) actually in dispute, (2) material to the motion, and (3) raise a genuine factual issue to be tried and have found none. Below defendants briefly address plaintiffs' 56.1 statement, but note here at the outset that most of the statements made by plaintiffs are objected to as either immaterial or not actually in dispute. Where there is a dispute between the parties as to the testimony received in this matter, the defendants start their response with <u>DENIED</u>.**

---

[1] Although there is no written requirement that a 56.1 statement contain only one material fact per paragraph nor a hard and fast page limit for a 56.1 statement, plaintiffs' statement is clearly not what is contemplated by the rule as it fails to concisely set forth a genuinely disputed factual issue that is material under the legal principles applicable to a resolution of the defendants' motion.

1

**DEPOSITION TESTIMONY OF WALTER CAMINADE**

1. SAM'S CLUB employed Mr. Caminade[2] at the Elmsford location beginning in approximately 1994. (Ex. A pp. 10, 14). **Admitted, but does not contain a disputed fact and is not material.** Mr. Caminade worked in "receiving" from approximately 1995 until transferring to the freezer/cooler section in 2017 or 2018. (Ex. A, pp. 14-17, 66, 67). **Admitted, but does not contain a disputed fact and is not material.** Mr. Caminade's employment duties, while in "receiving", included using a forklift to load bales of compressed cardboard into trailers parked at the loading dock. (Ex. A, pp. 14-17, 57, 58, 66, 67, 70). **Admitted, but does not contain a disputed fact and is not material.** Mr. Caminade testified that WAL-MART and SAM'S CLUB ship, supply, and sell the compressed bales of cardboard for recycling. (Ex. A, pp. 102, 103). **<u>DENIED</u>. Plaintiffs' per diem counsel chose to combine the two defendants into one entity "Walmart Sam's Club" when questioning this witness. There is no such entity. Further, Mr. Caminade only admitted that the cardboard was sent out for recycling. He had no idea whether it was sold (Plaintiff's Ex. A, p. 102-103).**

2. WAL-MART and SAM'S CLUB trained Mr. Caminade prior to May 29, 2015. (Ex. A, pp. 23-26). **That is how this witness was questioned, but Mr. Caminade is employed by defendant, SAM'S EAST, INC., not by WAL-MART STORES, INC. Any training he received came from SAM'S EAST, INC.** WAL-MART and SAM'S CLUB provided Mr. Caminade with both written and verbal instructions regarding the <u>company's</u> standards, guidelines, procedures, and professional standards of care as well as the <u>industry</u> standards and guidelines. (Ex. A, pp. 23-26, 37, 38). **That is how this witness was questioned, but Mr. Caminade is**

---

[2]. Mr. Caminade attended a vocational high school in Guatemala and testified via an interpreter. If the Court reviews his transcript, it will note that most of the questions posed to Mr. Caminade were leading and objectionable.

2

employed by defendant, SAM'S EAST, INC., not by WAL-MART STORES, INC. Any training he received came from SAM'S EAST, INC. Moreover, "industry standards and guidelines"[3] were never identified during this deposition. WAL-MART and SAM'S CLUB instructed all employees to comply with the company's standards, guidelines, procedures, and professional standards of care and with the industry standards and guidelines, always, not just in 2015. (Ex. A, pp. 37, 38). **Defendants do not understand this factual assertion in conjunction with its citation to the record. No part of the testimony received at pages 37 and 38 has anything to do with a difference between compliance with internal rules or "industry standards" in 2015 or compliance with internal rules or "industry standards" "always."** Mr. Uzhca identified WAL-MART'S and SAM'S CLUB'S written loading guidelines when preparing to load a trailer for shipment that was marked as Plaintiff's Exhibit 2 on April 9, 2019. (Ex. A, pp. 40, 43, 50, 53, 55; *See, also* Ex. J, p. 10). **DENIED. Mr. Caminade testified that he had never seen that document before (Ex. A, p. 43, 50). Moreover, the document was shown in English to a Spanish-speaking witness and it specifically states that it is for the defendants' Distribution Centers and for pick-ups of merchandise scheduled through Wal-Mart's Corporate Traffic Department (Plaintiff's Exhibit J, p. 3). The Sam's Club in Elmsford, New York is a consumer-member club, <u>not</u> a Distribution Center. Moreover, the cardboard at issue was scheduled for pick-up by a telephone call from that Sam's Club to American Paper (Defendants' Ex. E, p. 12; Ex. F, p. 12; Ex. G, p. 53-54). It was <u>not</u> scheduled through Wal-Mart's Corporate Traffic Department.**

---

[3]. Mr. Petrowski: "Objection to form. What industry are you talking about?" Mr. Genis: "Well, I just said industry standards and guidelines." (Plaintiff's Exhibit A, p. 38).

3. Mr. Caminade testified that all truck drivers leaving the loading dock at the Elmsford facility in 2015, expect and rely upon all WAL-MART and SAM'S CLUB employees to comply with, and properly and safely perform, the company's professional standards of care and guidelines, as well as the industry standards and guidelines. (Ex. A, pp. 33, 34, 38, 39, 100, 103, 104). **Defendants objected to each of these questions.** Mr. Caminade testified that WAL-MART and SAM'S CLUB required its employees to load the trailers to full capacity for profitability whenever possible. (Ex. A, p.p. 39, 40, 53, 54, 56, 57; *See, also*, Ex. J, pp. 10, 26, 27). **Admitted, but does not contain a disputed fact. Both Sam's East, Inc. and American Recycling testified at depositions that the trailers were packed until full. (Defendant's Ex. E, p. 77-78).**

4. Mr. Caminade loaded the heavy bales of cardboard into the 53-foot long trailers, three-bales high, from floor to ceiling, starting in the front of the trailer and continuing down, filling the trailer as close as possible to the rear. (Ex. A, p.p. 58, 60, 69, 70-73, 75). The top bale would be about one foot below the ceiling of the trailer. (Ex. A, p..71, 72, 75). **Admitted, but does not contain a disputed fact.**

5. Mr. Caminade testified it is important that the bales of cardboard are properly secured so that they do not fall on someone and cause serious injury, that bale securement depends on bale placement, and that if the bales are not properly placed inside the trailer, then the bales will not be properly secured. (Ex. A, pp. 73- 77). **Admitted, but does not contain a disputed fact.**

6. Mr. Caminade further testified that WAL-MART and SAM'S CLUB employees will correct the placement of the bales if the employees notice the bales are not properly placed pursuant to the company's good and accepted practice and procedure, professional standards, and

pursuant to industry guidelines and standards, and custom and practice in the field and industry, (Ex. A, pp. 76, 77, 78). **Admitted, but plaintiff's counsel did not identify "industry standards" during this deposition.**

7. Mr. Caminade testified that placement of cargo affects security and safety. (Ex. A, p. 78). Mr. Caminade testified that using some sort of tying or tethering device is a proper means to secure the bales of compressed cardboard, but WAL-MART and SAM'S CLUB do not use these devices. (Ex. A, pp. 78, 80). Mr. Caminade testified that straps, also known as low bars, are also good and accepted practice or means to secure bales of cardboard properly, but WAL-MART and SAM'S CLUB do not use these safety devices either. (Ex. A, pp. 80-82). Mr. Caminade testified that using low bars and strapping to secure the bales of compressed cardboard inside trailers complies with professional standards, industry standards, industry guidelines, and with customs and practices in the industry. (Ex. A, pp. 83, 84). **These allegations do <u>not</u> contain a material issue of fact and are asserted here for no other purpose than a misguided attempt to avoid summary judgment. They are in complete derogation of the sworn testimony of plaintiffs' own expert who testified that the packing of cardboard bales in an enclosed trailer does <u>not</u> require any additional load securement devices (Defendant's Ex. L, p. 30). "The cargo that's within an enclosed box trailer does <u>not</u> need additional load securement." (Ex. L, p. 57). That is because freight contained within the walls of a trailer and leaning against other freight is generally considered secure and "<u>no other devices are required</u>" (Ex. L, p. 31-32, 64).**

8. Mr. Caminade testified that improperly placed cargo and improperly secured cargo may cause unnecessary harm to individuals. (Ex. A, p. 87). Mr. Caminade testified that it is vitally important to place the bales of cardboard properly to prevent unnecessary harm to people in

5

instances where low bars or straps are not used to tie down or tether the cargo and that cargo will not be secure if it is not properly placed. (A, p.p. 85-87). **These allegations do not contain a material issue of fact and are asserted here for no other purpose than a misguided attempt to avoid summary judgment. They are in complete derogation of the sworn testimony of plaintiffs' own expert who testified that the packing of cardboard bales in an enclosed trailer does not require any additional load securement devices (Defendant's Ex. L, p. 30). "The cargo that's within an enclosed box trailer does not need additional load securement." (Ex. L, p. 57). That is because freight contained within the walls of a trailer and leaning against other freight is generally considered secure and "no other devices are required" (Ex. L, p. 31-32, 64).**

9. Mr. Caminade testified that in accordance with his training by WAL-MART and SAM'S CLUB, regarding the company's standards, policies, guidelines and procedures and regarding the industry procedures, employees are never allowed to unnecessarily expose someone to harm and that the compressed bales of cardboard must be loaded in such a manner as to avoid unnecessarily exposing anyone to harm. (Ex. A, pp. 87-92). That means placing and securing the bales of cardboard in such a manner that it will not fall on someone else and harm them. (Ex. A, p.p. 89, 90). Mr. Caminade testified that the truck drivers who drive the fully loaded tractor-trailers have a right to rely on the expertise of WAL-MART and SAM'S CLUB employees and how they load the trailers with bales of compressed cardboard. (Ex. A, p.p. 90, 91). **Admitted that Mr. Caminade answered, over objection, "that's how it is" to various scenarios proposed by per diem counsel, none of which are material to defendants' motion for summary judgment.**

10. Mr. Caminade testified that anti-skid or anti-slipping sheets are safety devices that can be placed to make it less likely for bales of cardboard to fall, or slip, or move. (Ex. A, p.p. 104,

105). Mr. Caminade testified that WAL-MART or SAM'S CLUB decides whether to use anti-skid or anti- slipping sheets. (Ex. A, p. 105). Mr. Caminade testified that it is safer to use the anti-skid or anti-slipping sheets, but that WAL-MART and SAM'S CLUB do not use either when the employees load the trailers with the compressed bales of cardboard. (Ex. A, p. 105). **These allegations do <u>not</u> contain a material issue of fact and are asserted here for no other purpose than a misguided attempt to avoid summary judgment. They are in complete derogation of the sworn testimony of plaintiffs' own expert who testified that the packing of cardboard bales in an enclosed trailer does <u>not</u> require any additional load securement devices (Defendant's Ex. L, p. 30). "The cargo that's within an enclosed box trailer does <u>not</u> need additional load securement." (Ex. L, p. 57). That is because freight contained within the walls of a trailer and leaning against other freight is generally considered secure and "<u>no other devices are required</u>" (Ex. L, p. 31-32, 64).**

11. Mr. Caminade testified that WAL-MART and SAM'S CLUB employees are required to place, load, and secure the bales of cardboard, properly, in such a manner that they will not move about and fall on the person who opens the rear doors later to unload, causing harm. (Ex. A, pp. 91, 92, 100, 101). Mr. Caminade testified that if the row closest to the door at the back of the trailer is only two bales high instead of three bales high, it is less likely that any of the bales will fall out onto the individual who opens the rear trailer doors. (Ex. A, p. 104). **<u>DENIED</u>. Admitted that Mr. Caminade answered, over objection, "yes, two, yes, yes, two" to the question asked by per diem counsel, but deny that Mr. Caminade's opinion is material to defendants' motion for summary judgment. Moreover, on a page that plaintiffs' counsel failed to submit to the Court, Mr. Caminade later testified that he did not know whether**

7

**there was a requirement that bales only be stacked two high at the rear of the trailer (Defendants' Reply Exhibit A, p. 114).**

12. Mr. Caminade testified that he agreed that the exhibit marked as Defendant's B on March 19, 2019 are WAL-MART'S and SAM'S CLUB written, applicable standards for the safe shipping, placement and securing of the compressed bales of recyclable cardboard that all WAL-MART and SAM'S CLUB employees are required to be follow. (Ex. A, pp. 100-104, 110, 111, 113 line 21; *See, also*, Ex. G-Defendant's Exhibit B marked for identification on March 19, 2019). **DENIED**. **Again, this Spanish-speaking forklift driver was shown a 23-page document in English and asked to agree, over objection, that said document pertained to his job at Sam's Club (Ex. A, p 102). Later in his deposition, again in a page not submitted to this Court by plaintiffs' counsel, he clearly testified that he did not know whether Exhibit B set forth a requirement for recycling cardboard from Sam's Club (Defendants' Reply Exhibit A, p. 114).**

13. Page 3 of Defendant's Exhibit B marked for identification on March 19, 2019 states the following regarding loading: "how to prevent bale from falling or shifting against the door during transit, that the last row of bales must be no more than two high, there will be no exceptions to this rule." (Ex. G). **Admitted that the ISRI document that plaintiff's expert found on the internet reads as such.**

## DEPOSITION TESTIMONY OF BRIAN KELLY

14. The May 29, 2015 daily route sheet documents that America Paper Mills' former employee and truck driver, Brian Kelly, drove an empty trailer, number 5563, from the depot to SAM'S CLUB in Elmsford where Mr. Kelly exchanged the empty trailer for a fully loaded trailer, number 3263, and then parked the fully loaded trailer number 3263 at the depot where Mr. Uzhca

8

sustained serious injuries. (Ex. B, pp. 9 - 17, 26, 27, 29, 30, 33-35, 54, 66, 97; *See, also*, Ex. H). **That is how Mr. Kelly testified except that he made no mention of a "depot where Mr. Uzhca sustained serious injuries."**

15. Mr. Kelly testified that SAM'S CLUB employees pack the trailers with compressed bales of cardboard before he arrives at the SAM'S CLUB facility. (Ex. B, pp. 23, 62). Mr. Kelly never observed the actual loading process. (Ex. B, p.p. 62, 63, 68). Mr. Kelly testified that it was his responsibility to make sure the truck is safe for travel on the roadway when he leaves SAM'S CLUB with a fully loaded trailer. (Ex. B, pp. 36, 37). Mr. Kelly testified that he would routinely check the fully loaded trailer before leaving SAM'S CLUB to make "sure the bar was on or the strap or something" and then close the doors. (Ex. B, pp. 18, 19). Mr. Kelly testified that the purpose of checking the load was "just to make sure it looks secure for driving the five- mile, ten-minute drive back to the depot, that the "cardboard was in good", "not hanging", and that "there's a safety bar on it". (Ex. B, pp. 19, 26, 27, 107). **That is how Mr. Kelly testified.**

16. Mr. Kelly generally observed the fully loaded trailer had only one wide column with a total of 22 or 24 bales of compressed cardboard, twelve rows of 2 bales stacked one on top of the other. (Ex. B, pp. 69, 118, 119). Mr. Kelly usually observed only one wide row of "doubled stacked" bales, "one on top of the other" all the way to the back door as close to the back door as possible. (Ex. B, pp. 69 -71). Mr. Kelly testified that it was too tight for him to climb into the trailer and walk the distance of the trailer from the front to the rear. (Ex. B, p. 71, 118). There would only be about one foot or one foot and one-half from the top bale to the ceiling of the trailer and about six inches on either side. (Ex. B, pp. 118, 119). **That is how Mr. Kelly testified.**

17. Mr. Kelly testified that he would only visually eyeball the loaded trailer while standing outside the loaded trailer with the doors open before closing the doors and taking it away

9

from Sam's Club. (Ex. B, pp. 76, 77). Mr. Kelly testified that the trailers, regularly, but not always have the horizontal bars locked in place in front of the last row of bales closest to the rear doors. (Ex. B, pp. 76, 77). The bales would be directly behind the horizontal bars and help safely secure the load and keep the load from coming to the back door. (Ex. B, pp. 77- 79). Mr. Kelly testified that he was not sure if a horizontal bar was always used with the trailers from SAM'S CLUB. (Ex. B, pp. 88, 89). Mr. Kelly testified that he would only "sometimes" place a horizontal "bar" or strap in front of the last row of bales closest to the rear doors to prevent movement and sliding towards the door. (Ex. B, pp. 71,72, 101). Mr. Kelly did not recall whether a bar was used on May 29, 2015. (Ex. B, p. 106). **That is how Mr. Kelly testified. He also testified that the bars belonged to American Paper and that it was American Paper, not the Sam's Club, that was required by law to check the load before it left the Sam's Club (Defendant's Exhibit H, p. 76, 37).**

18. Mr. Kelly testified that he never saw the bales on the trailers from SAM'S CLUB packed three high. (Ex. B, pp. 91, 92). Mr. Kelly testified that he would tell the SAM'S CLUB employee to remove the top third level for safety because "there is too much moving around, and the trailers are already top heavy to begin with." (Ex. B, p.p. 92, 93). **That is how Mr. Kelly testified.**

## DEPOSITION TESTIMONY OF WINSTON ASH

19. American Paper Mills employed Mr. Ash as the plant manager, and Mr. Ash was Mr. Uzhca's supervisor. (Ex. C, p. 9). Mr. Ash's work responsibilities included receiving recyclable materials from customers, including receiving cardboard bales from SAM'S CLUB in Elmsford. (Ex. C, pp. 9, 11, 19, 20, 30). **That is how Mr. Ash testified.**

20. On May 29, 2015, upon hearing Mr. Uzhca scream, Mr. Ash ran towards the loading dock, and observed Mr. Uzhca lying slightly face-down on the ground, in severe pain,

behind the rear of a trailer, about one foot underneath the back of the trailer, and pinned underneath two 900-pound bales of compressed cardboard. (Ex. C, pp. 34- 37, 40, 71, 72, 83, 85, 110). Mr. Ash observed the trailer Mr. Uzhca was working on and that three bales of cardboard were on the ground. (Ex. C, p. 46). Mr. Ash observed that both rear doors of the trailer were open. (Ex. C, p. 84). **That is how Mr. Ash testified.**

21. Mr. Ash determined the bales of cardboard came from SAM'S CLUB based upon the appearance of the bales in as much as the bales from different companies are tied differently and weigh differently and based upon the daily route sheet and the driver's paperwork. (Ex. C, pp. 13, 14, 18, 19, 37-38, 46, 47, 49, 50, 73, 74, 116, 117; *See, also* Ex. H). According to the driver's paperwork, Mr. Brian Kelly dropped off empty trailer 5563 at SAM'S CLUB in Elmsford on May 29, 2015 and returned to the depot with a fully loaded trailer, number 3263. (Ex. C, pp. 49-53, 62, 63, 68, 69; See, also Ex. L). **That is how Mr. Ash testified, but defendants already presumed that the trailer at issue came from the Sam's Club for the purposes of this motion. Thus, opposing counsel is simply wasting this Court's time.**

22. Mr. Ash testified that it is SAM'S CLUB'S responsibility to load the trailers safely and to make sure it is loaded correctly and safely. (Ex. C, pp. 91, 118). Mr. Ash testified that it is their driver's responsibility to make sure the trailer is loaded correctly before leaving SAM'S CLUB only to ensure that it is safe to travel on the roadway. (C, pp. 15-17, 91, 117, 118). **Mr. Ash did not so testify. Counsel has inappropriately added the word "only" to his characterization of Mr. Ash's testimony.**

23. Mr. Ash testified that their driver cannot walk inside the trailer to check the load because the load is stacked too close to the rear edge of the trailer and too close to either side of the trailer. (Ex. C, p. 91, 119, 120). Mr. Ash testified that their driver can only visually observe

11

the load by looking at the distance of the last row of bales from the rear edge of the trailer, and to see that the bales in the last row are stacked straight up and down and not tipping over. (Ex. C, pp. 94, 95, 107, 108, 119 -121). Mr. Ash testified that the only "bad way" for SAM'S Clubs to load the trailer is if the bales are tipping over because the driver is not permitted to take the load on the road if the load is tipping over. (Ex. C, pp. 94, 95). Mr. Ash testified that cardboard bales from SAM'S CLUB are stacked in one row in the middle, three bales high. (Ex. C, p. 107, 108). The driver can only see the last row of bales closest to the edge of the rear doors. (Ex. C, pp. 107, 108, 119-121). The driver cannot see how many bales are stacked behind the row closest to the rear doors. (Ex. C, pp. 119-121). Mr. Ash testified that the driver can only visually determine whether the row closest to the rear door is loaded safely. (Ex. C, p.p. 119-121). **That is how Mr. Ash testified.**

## **DEPOSITION TESTIMONY OF ROBERT O'NEILL**

24. SAM'S CLUB employed Robert O'Neill as the general manager at the Elmsford location in May 2015. (Ex. D, pp. 8, 13). In May 2015, SAM'S CLUB employees compressed cardboard boxes in a compactor at the Elmsford facility and loaded the bales of cardboard into trailers for pick-up by American Paper Mills drivers. (Ex. D, pp. 12, 38, 39 40-44, 46, 47). **That is how Mr. O'Neill testified.**

25. Mr. O'Neill testified that the SAM'S CLUB employee forklift operators are trained to load the wire tied cardboard bales into the approximate 53-foot long trailers by forklift from the front to the rear, three bales high, until the trailer is fully loaded, and no more bales can fit into the trailer. (Ex. D, pp. 53-56, 58-60, 90). Mr. O'Neill testified that it is cost effective and "ideal" to fill the trailer to capacity. (Ex. D, 67, 68). In May 2015, the loading of the cardboard bales into the trailer was entirely performed and overseen by SAM'S CLUB. (Ex. D, pp. 87, 106**). That is**

how Mr. O'Neill testified except no part of the testimony on the cited pages, 67 and 68, demonstrate that Mr. O'Neill testified that it was "cost effective." The correct citation is to page 55 of Mr. O'Neill's deposition where he testified that "[y]ou want to fill up the trailer [because i]t's a cost every time they would have to come out."**

26. Mr. O'Neill testified that it is a "safety" issue to ensure that the trailers were safely and properly loaded. (Ex. D, p. 87). **Nothing on page 87 references a "safety issue." The correct cite, for the Court's ease of reference, is page 91.** Mr. O'Neill testified that if loaded material was tilting in some way when it left SAM'S CLUB, then that could present a danger in tipping over when the truck and the trailer were moving to its final destination and could also possibly present difficulties or problems for those individuals unloading the trailer at its final destination. (Ex. D, pp. 92, 93). **That is how Mr. O'Neill testified.**

27. As the manager, Mr. O'Neill would only, on occasion, walk by the open trailer, visually "eyeball it" and look inside at the closest row of bales to see if anything is tipping over or if the second or third bale is not sitting right on top of the first one. (Ex. D, pp. 87, 89). **DENIED. That is not how Mr. O'Neill testified. He testified that he visually inspected the trailer "four to five times" or a "few times a day." (Ex. D, p. 87-89).** Mr. O'Neill would instruct the forklift operator to re-stack the bales if he saw the bales were not stacked properly for "safety" because Mr. O'Neill knew that an improperly stacked bale "could fall over", "tip", or "an associate could be loading another bale and it could come down and hit somebody." (Ex. D, pp. 90-92). Mr. O'Neill testified that he did not ensure that every load was safely loaded in 2015; instead, Mr. O'Neill left that responsibility entirely to the American Paper Mills driver to check for safety and stability of the load. (Ex. D, p. 93). **DENIED. Defendants object to the characterization of Mr. O'Neill's testimony. The testimony was as follows: I didn't ensure every one was, you**

know, safely loaded.  Ultimately, when the truck pulls out before the truck is closed, it's the truck driver that checks for the safety and stability of the load." (Ex. D, p. 93).** Mr. O'Neill testified that sometimes loading can be unsafe. (Ex. D, pp. 101, 102). **That is how Mr. O'Neill testified.**

28. Mr. O'Neill testified that the trailers are packed one row straight with three bales high, one bale directly on top of another without pallets; that it is physically impossible for two bales to be placed next to each other. (Ex. D, pp. 102-104, 115). Mr. O'Neill testified that after the one row is loaded onto the trailer from the front to the rear three high - there is about a space of six inches to eight inches from the top bale to the ceiling of the trailer. (Ex. D, p. 115). Mr. O'Neill testified that there is only a small amount of space on either side of the stacked row and that it is too small for a person to walk through or to lie on their stomach and go through the length of the trailer. (Ex. D, pp. 119, 120). Mr. O'Neill testified that there is nothing else for the SAM'S CLUB employee to do after the last row is placed onto the trailer to bolster or further secure the entire bales. (Ex. D, p. 120). Mr. O'Neill testified there would be about eight inches or less between the last row of bales and the closed doors. (Ex. D, p. 121). **That is how Mr. O'Neill testified.**

29. Mr. O'Neill testified that it is possible that the bales could fall out of the trailer due to improper loading upon opening the two rear doors, that "it is a known fact", and that he "heard it from truck drivers before." (Ex. D, pp. 125, 126). **<u>DENIED.</u> That is a shocking misstatement of how Mr. O'Neill testified.  He testified that there were two reasons why someone might get hurt opening the rear doors of a trailer:  (1) unsafe driving or (2) unsafe opening of those doors.   When asked whether improper loading was a third possibility, he testified: "Anything is a possibility.  It's possible, but it's also the truck driver's responsibility to check their load before going on the road.  He was then asked:  "And how do you know that?"  He**

14

responded: "That's a known fact. I have heard it from truck drivers before. All truck drivers, when they were picking up anything from us, they're always checking the load and making sure it's a safe load to go on the road." (Ex. D, p. 125-126). Mr. O'Neill testified that all truck drivers check the load before leaving SAM'S CLUB to make sure the load is safe to go on the road. (Ex. D, p. 126). Mr. O'Neill testified that drivers "double check" the Sam's Club employees who load the trailer, like a "check and balance". (Ex. D, p. 127). Mr. O'Neill agrees that it is very difficult if not impossible for a person to get onto the trailer when it is fully loaded and to walk the length of the trailer that is fully loaded with the cardboard bales. (Ex. D, p. 127). **That is how Mr. O'Neill testified.**

## DEPOSITION TESTIMONY OF PLAINTIFF'S EXPERT BROOKS RUGEMER

30. Plaintiff's expert, Brooks Rugemer, testified that his analysis and opinions are premised upon Mr. Uzhca's accident being a workplace accident that involved a motor vehicle as opposed to a commercial vehicle accident. (Ex. E, pp. 13, 14). **Mr. Rugemer was asked whether the accident was considered a "commercial vehicle accident" and responded: "It is a workplace accident that involved a motor vehicle."** Mr. Rugemer testified that his report and opinions addresses truck and trailer loading and material handling. (Ex. E, pp. 17, 18; *See, also* Ex. I). **That is how Mr. Rugemer testified.** Mr. Rugemer testified he did not render an opinion in his report regarding motor carrier management. (Ex. E, p. 17). **That is how Mr. Rugemer testified.**

31. Mr. Rugemer reviewed the relevant materials and applied the industry standards promulgated by The Institute of Scrap Recycling Industries, (ISRI), to render his opinions set forth in his report. (Ex. E, pp. 19, 24, 25; *See, also*, Ex. G; *See, also*, Ex. I). **DENIED**. Defendants

**object to the characterization of the ISRI document Mr. Rugemer found on the internet as "industry standards."**

32. According to Mr. Rugemer, it was foreseeable when the SAM'S CLUB employee loaded the trailer that an injury could occur by bales falling out of the trailer and that SAM'S CLUB violated an industry standard and not a regulatory standard. (Ex. E, pp. 23, 24). **That is how Mr. Rugemer testified, but defendants object to the characterization of the ISRI document as "industry standards."** Mr. Rugemer testified that while the incident location is an OSHA governed site, SAM'S CLUB did not violate a regulatory duty owed to Plaintiff under OSHA, the Federal Motor Carrier Safety Administration (F.M.C.S.A.), or the Department of Transportation. (Ex. E, pp. 23, 24; 56-60). Mr. Rugemer testified that F.M.C.S.A. regulations, specifically F.M.C.S.R. 393.100, concerning load securement, applies to trucks or trailers that are on the highways. (Ex. E, pp. 23, 56-58). Mr. Uzhca's incident did not occur on a public roadway. (Ex. E, pp. 23, 56-58, 60, 64). The transit was already complete at the time of occurrence; therefore, F.M.C.S.R. and the Department of Transportation regulations are not applicable. (Ex. E, pp. 23, 56-58, 60, 64). According to Mr. Rugemer, liability against SAM'S CLUB is based upon improper load securement that occurred at the SAM'S CLUB facility. (Ex. E, p.p. 57, 58). **That is how Mr. Rugemer testified, although defendants object to his opinion. See Point II of defendant's Memorandum of Law.**

33. Mr. Rugemer testified that SAM'S CLUB, as the shipper of the cardboard bales, is required to research and adopt safe and proper methods to ship their goods. (Ex. E, pp. 26-29). The safe loading/unloading guidelines and loading diagrams developed by the ISRI are on-line and available to the public including Sam's Club. (Ex. E, p.p. 26-29). ). **That is how Mr. Rugemer**

**testified, although defendants object to his opinion. See Point II of defendant's Memorandum of Law.**

35. Mr. Rugemer testified that securement is a different function from loading. (Ex. E, p. 30). Mr. Rugemer testified that the driver can only check the loaded trailer to the extent he is able. (Ex. E, p. 30). Mr. Rugemer further testified that the F.M.C.S.A. agrees that many loads can be safely transported in a van type vehicle using correct loading patterns, without any additional forms of securement. (Ex. E, pp. 30, 31). Mr. Rugemer testified that a driver's duty to check a load covers only (1) making sure that everything is in the trailer, (2) making sure there is nothing leaking from the trailer, (3) making sure his load is not overweight and over length. (Ex. E, pp. 30, 31). The Department of Transportation also relies upon the F.M.C.S.A. (Ex. E, pp. 30, 31). **That is how Mr. Rugemer testified, although defendants object to his opinion. See Point II of defendant's Memorandum of Law.**

35. Mr. Rugemer opined that loads in an enclosed trailer, such as the American Paper Mills trailer at issue, do not require the same level of securement as a flatbed. (Ex. E, pp. 31, 32). According to Mr. Rugemer, and based upon the industry standards promulgated by ISRI, the last row of bales loaded in a flatbed and in an enclosed trailer, such as the American Paper Mills trailer involved in Mr. Uzhca's incident, should only be loaded two-bales high and not three-bales high. (Ex. E, pp. 31-34; *See, also*, Ex. G; *See, also*, Ex. I). According to Mr. Rugemer, loading the last row of cardboard bales three-high against the rear doors of the trailer is not within good and accepted industry standards. (Ex. E, p. 34). Mr. Rugemer testified that an unstable load can come crashing out of the trailer which is what happened to Mr. Uzcha when the doors were opened. (Ex. E, p. 38). ). **That is how Mr. Rugemer testified, although defendants object to his opinion. See Point II of defendant's Memorandum of Law.**

**DEPOSITION TESTIMONY OF DEFENDANT'S EXPERT CHRISTOPHER FERRONE**

36. Defendant's expert, Christopher Ferrone[4] testified that cargo must be properly secured. (Ex. F, p. 43). Mr. Ferrone testified that this case is primarily about loading, placement and securing of cargo. (Ex. F, p. 54). **That is how Mr. Ferrone testified.**

37. Mr. Ferrone agrees that drivers have a right to expect that WAL-MART or SAM'S CLUB will comply with good and accepted safety practices and procedure and that best practices and existing standards of care with respect to safety will be complied with. (Ex. F, pp. 204, 205). Mr. Ferrone testified that if cargo is not properly loaded, placed and secured inside a trailer it is possible for people to be unnecessarily and seriously harmed. (Ex. F, p. 233). **That is not how Mr. Ferrone testified. Over objection, Mr. Ferrone testified that a driver <u>generally</u> has a such a right <u>if</u> such standards exist.**

38. Mr. Ferrone agrees that the cardboard bales were not properly secured. (Ex. F, p. 238). **DENIED. Mr. Ferrone did not testify that the bales were not <u>properly</u> secured. He testified that they weren't secured.** Mr. Ferrone testified placement of cargo may provide partial security. (Ex. F, p. 238). Mr. Ferrone testified that placement of cargo and security of cargo can be independent of each other and can also be interrelated. (Ex. F, p. 238). Mr. Ferrone testified that he believed that the cargo was not properly secured which was causal to the accident and that to the degree that placement affects securement, placement could also be a substantial factor in causing this accident, but they do not have to be connected. **DENIED. Mr. Ferrone did not testify that the cargo was not <u>properly</u> secured. He testified that it was not secured.** (Ex. F, p.240). Mr. Ferrone agrees that if the cargo was not properly loaded, placed, and secured, then

---

[4] If the Court decides to conduct an assiduous review of the record, it will discover that Mr. Ferrone was subjected to a five hour examination characterized by attacks against him and questioning in improper form, the sum total of which resulted in his opinion that the load was placed properly by Sam's East, Inc. and that any further securement of the load was "on the shoulders of the motor carrier." (Defendant's Reply Exhibit B, p. 301).

this accident would more likely not have occurred. (Ex. F, pp. 240, 241). **Mr. Ferrone's testimony was actually: "If it doesn't fall, I can't imagine he gets hurt."**

39. Mr. Ferrone testified that WAL-MART and SAM'S CLUB shipped and supplied the carboard bales, loaded the trailer, and are responsible for placement of the cargo. (Ex. F, pp. 245, 250, 260, 262). Mr. Ferrone agrees in general with the contents of the ISRI safety manual. (Ex. F, p. 279; *See, also*, Ex. G). Mr. Ferrone agrees that WAL-MART and SAM'S CLUB did not load, place, and secure the cargo in the manner prescribed by Mr. Rugemer. (Ex. F, pp. 243, 244). That is how Mr. Ferrone testified.

40. Mr. Ferrone agrees that properly placed cargo can sometimes act as a form of securement. (Ex. F, p. 242). Mr. Ferrone agrees with Mr. Rugemer's opinion that the last row of bales should have been loaded only two-high, is an option, but had it been secured, that option would not be needed. (Ex. F, p. 242). **Defendants are unsure what plaintiffs are trying to convey in this poorly worded assertion. Mr. Ferrone testified that placing bales only two high in the trailer was an option, but that option is not needed had American Paper secured the load (Ex. F, p. 242).** Mr. Ferrone testified that both the individuals who loaded the trailer and the driver have opportunities to look at the placement of the cargo. (Ex. F, pp. 279, 280**). That is how Mr. Ferrone testified.**

41. Mr. Ferrone testified that WAL-MART and SAM'S CLUB should properly load and place the cargo inside the trailer, but it is not their responsibility to secure the cargo. (Ex. F, pp. 218, 223). Mr. Ferrone agrees that Mr. Uzhca's incident occurred on private property and not on an interstate highway, local highway, or on a public roadway, but nevertheless testified that the motor carrier was responsible for load securement as opposed to WAL-MART and SAM'S CLUB

under the F.M.C.S.R. and Department of Transportation. (Ex. F, pp. 244, 245, 293). **That is how Mr. Ferrone testified.**

Dated: New York, New York
December 23, 2019

                                                                                          _____/s_____
                                                                                        PATRICIA A. O'CONNOR