

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/14/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LUIS UZHCA and MARIA SMITH,

                Plaintiffs,

   -against-

WAL-MART STORES, INC., SAM'S EAST, INC.,
and INLAND-GREENBURGH DELAWARE
BUSINESS TRUST,

                Defendants.

---

No. 17-cv-3850 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

       Plaintiffs Luis Uzhca ("Plaintiff" or "Uzhca") and Maria Smith bring this personal injury action against Defendants Wal-Mart Stores, Inc. ("Wal-Mart"), Sam's East, Inc. ("Sam's East") (together, "Moving Defendants"), and Inland-Greenburgh Delaware Business Trust (collectively, "Defendants"). (ECF No. 1.) Plaintiff Uzhca asserts a claim for negligence, alleging that Defendants caused him to sustain injuries when the contents of a tractor/trailer loaded by Defendants fell out and struck him while he opened the tractor/trailer's rear door. (*Id.*) Separately, Plaintiff Smith asserts a loss of consortium claim against Defendants as a result of Plaintiff Uzhca's accident. (*Id.*) Presently before the Court is Moving Defendants' motion for summary judgment dismissing Plaintiff Uzhca's negligence claim. (ECF No. 63.) For the following reasons, Moving Defendants' motion is DENIED.

## BACKGROUND

       The following facts are drawn from a review of the record and the parties' Local Rule 56.1 statements. They are not in dispute unless otherwise noted.[1]

---

[1] Moving Defendants contend that Plaintiff's response to Moving Defendants' Local Rule 56.1 Statement of Material Facts ("Rule 56.1 Statement") contains improper legal arguments and does not satisfactorily respond

## A. Uzhca's Accident

Uzhca was an employee for Sani-Pro Disposal Services Corp. and had been assigned to work at the American Independent Paper Mills Supply Company, Inc. ("American Paper"), located at 15 S. Depot Plaza, Tarrytown, New York.  (Compl. ¶ 14.)  Sam's East is the operator of the Sam's Club in Elmsford, New York ("Sam's Club"), and Wal-Mart is, indirectly, the parent company of Sam's East.  (Defs.' Local Rule 56.1 Statement ("Defs. 56.1"), ECF No. 65, at n.3; Compl. ¶¶ 11-12; Aff. of Patricia O'Connor ("O'Connor Aff."), ECF No. 65-15, Ex. B at 1.)

While working at American Paper, Uzhca was responsible for getting truck cabs, securing them to one of approximately 10 or 11 trailers parked onsite, and moving the chosen trailer to within eight to ten feet of the loading dock.  (Defs. 56.1 ¶ 2; O'Connor Aff. Ex. D ("Uzhca Dep. Tr.") at 27:11-33:11, 52:10-19.)  Once a trailer was about eight to ten feet away from the loading dock, Uzhca would open its rear doors and then finish backing it into the loading dock.  (Uzhca Dep. Tr. at 34:6-35:6.)  Uzhca had done this type of work approximately 40 to 50 times prior to the date of his accident.  (Defs. 56.1 ¶ 2; Uzhca Dep. Tr. at 66:10-15.)

On May 29, 2015, at approximately 10:00 a.m., Uzhca's supervisor, Winston Ash ("Ash"), identified a trailer that he wanted Uzhca to move to the loading dock.  (Defs. 56.1 ¶ 3; Uzhca Dep. Tr. at 36:3-19, 51:5-19.)  The trailer, which is identified by the number 3263 ("Trailer 3263") contained bales of cardboard that had been delivered from Sam's East.  (Pl.'s Rule 56.1 Statement

---

to the facts in certain paragraphs of the statement.  (Defs. Reply to Pls. Counterstatement, ECF No. 67.) Defendants therefore request that the Court deem the facts in its Rule 56.1 Statement as true.  (*Id.*)  As both parties have, in general, complied with their obligations under Local Rule 56.1, the Court has chosen to review each parties' Local Rule 56.1 submissions and counterstatements, and has, in turn, compared the facts stated therein with its own review of the record.  Accordingly all material facts that are supported by the record will be set forth the Court.  Nevertheless, to the extent either parties' Local Rule 56.1 submissions make any legal arguments or contain facts that are not ultimately material to the resolution of the motions, those assertions will not be considered by the Court.

("Pl. 56.1"), ECF No. 66-15, ⁋⁋ 14, 21; O'Connor Aff. Ex. E ("Ash Dep. Tr.") at 19:19-20:6, 36:25-38:4, 41:17-25; O'Connor Ex. H ("Kelly Dep. Tr.") at 29:10-31:18, 33:17-34:6.)

Upon receiving Ash's instruction, Uzhca retrieved the truck cab and backed it into Trailer 3263, causing the two to physically connect. (Defs. 56.1 ⁋ 4; Uzhca Dep. Tr. at 53:4-54:22.) After connecting the truck cab and the trailer, Uzhca got out of the cab to make sure the connection was proper. (Defs. 56.1 ⁋ 5; Uzhca Dep. Tr. at 54:23-55:5.) Uzhca then lifted up the legs of the trailer so that it could be moved. (Defs. 56.1 ⁋ 5; Uzhca Dep. Tr. at 55:22-56:11.) Thereafter, Uzhca backed the trailer into a position approximately eight feet away from the loading dock. (Defs. 56.1 ⁋ 6; Uzhca Dep. Tr. at 56:12-57:5.)

Uzhca again got out of the truck cab and proceeded toward the rear of the trailer. (Defs. 56.1 ⁋ 7; Uzhca Dep. Tr. at 57:19-25.) Uzhca first opened the right-hand door of the trailer and secured it to prevent the door from closing. (Defs. 56.1 ⁋ 8; Uzhca Dep. Tr. at 60:3-61:7.) Upon opening the right-hand door, Uzhca saw the contents of the truck—bales of cardboard weighing between 600 to 900 pounds each. (Uzhca Dep. Tr. at 61:13-62:24, 63:11-19.) Uzhca testified that he saw a bundle of cardboard "touching the top" of the left door, while the bottom bundles were four inches from the door. (Defs. 56.1 ⁋ 10; Uzhca Dep. Tr. at 62:21-65:10.) But Uzhca also testified that the contents of the trailer did not look any different than in the past, and that they "always c[a]me[] like that." (Uzhca Dep. at Tr. 62:25-63:5, 65:4-10.)

After opening and securing the right-hand door, Uzhca proceeded to unlock the left-hand door of the trailer. (*Id.* at Tr. 67:6-10.) At that moment, the cardboard bales fell out of the trailer and caused the left-hand door to swing open and strike Uzhca's chest. (Defs. 56.1 ⁋ 11; Uzhca Dep. Tr. at 67:11-68:2.) Uzhca was knocked to the ground and, after the first two bales fell, he tried to drag himself out of the way. (Uzhca Dep. Tr. at 68:3-12.) As he was moving, the last bale

fell out of the trailer, causing Uzhca to lift out his right foot to prevent the bale from crushing him. (Defs. 56.1 ¶ 12; Uzhca Dep. Tr. at 68:24-69:24.)  The bale's sheer weight ultimately crushed and broke his foot.  (Uzhca Dep. Tr. at 69:25-70:11.)

**B.  The Recyclable Cardboard Bale Loading and Transportation Process**

    i.   *Sam's East's Loading of American Paper's Trailers*

On the date of Uzhca's accident, Sam's East was a customer of American Paper and would use American Paper to move recyclable cardboard from Sam's East's Sam's Club location in Elmsford, New York to American Paper's location in Tarrytown, New York.  (Defs. 56.1 ¶ 16; Ash Dep. Tr. at 19:19-20:6, O'Connor Aff. Ex. F ("Javier Dep. Tr.") at 22:19-25; O'Connor Aff. Ex. G ("O'Neill Dep. Tr.") at 38:6-39:3.)  The process would begin with an American Paper driver delivering an empty 53-foot trailer to Sam's Club.  (Defs. 56.1 ¶ 17; *see also* O'Neill Dep. Tr. at 47:15-24, 52:23-54:8.)  At Sam's Club, the empty trailer would eventually be placed in bay seven of the store's loading dock ("Bay Seven"), which was next to Sam's Club's compactor.  (Defs. 56.1 ¶ 17; O'Neill Dep. Tr. at 67:2-17.)

Sam's Club's employees would compact cardboard boxes together into bales that were approximately 36 inches high and five feet wide.  (Defs. 56.1 ¶ 17; Pl. 56.1 ¶ 24, O'Neill Dep. Tr. at 40:16-44:13.)  The bales were then loaded onto the trailer using forklifts.  (Defs. 56.1 ¶ 17; O'Neill Dep. Tr. at 54:13-55:3.)  As Sam's Club's general manager, Robert O'Neill ("O'Neill"), testified, each trailer was filled to capacity, in part because of cost but also because it created more stability.  (Pl. 56.1 ¶ 25; O'Neill Dep. Tr. at 55:10-20, 68:8-69:3.)  Ash corroborated this practice during his deposition, noting that trailers were packed until full.  (Defs. 56.1 ¶ 20; Ash Dep. Tr. at

77:21-78:9; *see also* Aff. of Michael Kremins ("Kremins Aff."), ECF No. 66-1, Ex. A ("Caminade Dep. Tr.")[2] at 39:10-40:7, 54:4-21.)

Sam's Club's employees would load bales onto the trailer from the front of the trailer to the rear, stacking them three high and in one row. (Pl. 56.1 ¶¶ 4, 25, 28; O'Neill Dep. Tr. at 53:19-55:3, 90:9-13, 103:5-20; Caminade Dep. Tr. at 69:15-73:15.) When fully stacked, the bales would be within 12 inches of the trailer's ceiling. (Defs. 56.1 ¶ 21; Pl. 56.1 ¶ 4; Ash Dep. Tr. at 99:6-99:17; Caminade Dep. Tr. at 71:21-72:13.) There would only be a limited amount of space on either side of the stacked row, making it too small of a space for a person to access. (Pl. 56.1 ¶ 28; O'Neill Dep. Tr. at 119:18-120:512.) If the loaded materials were tilting in anyway, a forklift operator would remove those bales and restack them in the trailer.[3] (Defs. 56.1 ¶ 23; Pl. 56.1 ¶ 27; O'Neill Dep. Tr. at 90:14-24; *see also* Caminade Dep. Tr. at 76:19-77:8.)

Walter Caminade, a former Sam's Club employee whose duties included loading cardboard bales into trailers, testified that Sam's Club did not use any tying or tethering device or straps (also known as low bars) to secure the cardboard bales. (Pl. 56.1 ¶ 7; Caminade Dep. Tr. at 80:8-23.) Caminade further testified that, when loading the bales on to the trailer, Sam's Club did not use anti-skid or anti-slipping sheets. (Pl. 56.1 ¶ 10; Caminade Dep. Tr. at 104:16-105:11.) However, in terms of securing the load, Plaintiff's expert, Brooks Rugemer ("Rugemer"), testified that the enclosed trailers—the kind into which Sam's Club cardboard bales were loaded—did not require the same level of securement as open flatbed trailers. (Defs. 56.1 ¶ 32; Pl. 56.1 ¶ 34; O'Connor Aff. Ex. L ("Rugemer Dep. Tr.") at 31:2-22.) More specifically, Rugemer testified that "cargo that's within an enclosed box trailer does not need additional load securement" because "freight

---

[2]     A complete transcript of the Deposition of Walter Caminade was provided by Defendants as Exhibit A to the Reply Affidavit of Patricia O'Connor. (ECF No. 68-1.)

[3]     O'Neill visually inspected the loaded materials "[a] few times a day" by looking for whether "something was either tilting or something as not straight" in the load. (O'Neill Dep. Tr. at 87:21-89:22.)

within a closed trailer that's loaded next to freight and next to the walls is considered secure and no other devices are required."  (Defs. 56.1 ⁋ 32; Rugemer Dep. Tr. at 57:4-58:6, 64:12-25.)

  ii.   *American Paper's Transportation of Loaded Trailers*

Once a trailer was almost full, Sam's Club would call American Paper to schedule a pickup. (Defs. 56.1 ⁋ 17; Ash Dep. Tr. at 12:9-14; Javier Dep. Tr. at 12:11-18; O'Neill Dep. Tr. at 53:25-54:4.) American Paper would, in turn, send a driver to bring another empty trailer to Sam's Club. (Defs. 56.1 ⁋ 18; O'Neill Dep. Tr. at 69:4-10.)  The driver would unhook the empty trailer upon arrival at Sam's Club and then hook the truck cab to the full trailer at Bay Seven.  (Defs. 56.1 ⁋ 18; O'Neill Dep. Tr. at 69:24-70:6.)  The driver would pull the full trailer about 60 to 80 feet away from the loading docks—going over a storm water drain and with the trailer's rear doors open—and park it on the side of the building.  (O'Neill Dep. Tr. at 71:14-72:6, 72:21-74:19, 76:18-24.)

After pulling out the trailer, the driver would inspect the load to make sure it was safe for travel.  (Defs. 56.1 ⁋ 18; Pl. 56.1 ⁋ 15; O'Connor Aff. Ex. H ("Kelly Dep. Tr.") at 18:21-25, 36:17-37:12)  The driver did so because, while it was Sam's Club's responsibility to load the trailer correctly and safely (Pl. 56.1 ⁋ 22; Ash Dep. Tr. at 91:16-18, 118:15-22), it was ultimately "required by law" that American Paper's driver make sure that the trailer was properly loaded and safe to transport.  (Defs. 56.1 ⁋ 30; Kelly Dep. Tr. at 37:9-12; Ash Dep. Tr. at 15:13-16:23, 91:18-21.)  As explained by Brian Kelly, a former American Paper driver who was responsible for transporting Trailer 3263 on May 29, 2015, drivers were to make sure that the load was secure, nothing was "hanging there," and a safety bar was set in place.  (Defs. 56.1 ⁋ 30; Pl. 56.1 ⁋⁋ 14-15; Kelly Dep. Tr. at 19:17-25.)  To this end, although he confirmed that the space inside the trailer was too tight for a driver to climb or walk into, Kelly testified that drivers could at least evaluate

whether the bales "were even" and that "nothing was rocking."[4]  (Pl. 56.1 ¶¶ 16-17; Kelly Dep. Tr. at 71:10-73:9; *see also* Ash Dep. Tr. at 94:6-11, 120:10-12 ("The way to observe [the load] is to check how far it is from the edge of the trailer, and to make sure that they're stacked up and down, or . . . straight.")).  If the cardboard bales were not properly loaded, the driver would not take the load until it was fixed.  (Defs. 56.1 ¶ 29; Ash Dep. Tr. at 94:17-95:8.)

After the check was complete, the driver would close the trailer's doors and drive to American Paper.  (Defs. 56.1 ¶ 18; Kelly Dep. Tr. at 17:17-19:2.)  The distance from Sam's Club to American Paper was approximately five miles and the drive would take 10 minutes.  (Defs. 56.1 ¶ 18; Kelly Dep. Tr. at 107:13-18.)  The drive required the cab and trailer to go down some hills. (Defs. 56.1 ¶ 18; Kelly Dep. Tr. at 107:24-108:4.)

### iii.   *Deponents Prior Experiences with Sam's Club's Bale Loads*

Although none witnessed Uzhca's accident, several individuals have testified regarding their prior experiences with Sam's Club's cardboard bale loads.  For example, O'Neill has testified that, over the course of seeing approximately 50 American Paper trailers being pulled away from Sam's Club's loading dock, he never observed any of the bales inside the trailers move.  (Defs. 56.1 ¶ 23; O'Neill Dep. Tr. at 76:4-78:7.)  Similarly, Ash testified that he did not recall any issues with Sam's Club's trailers, but noted that, if a driver saw an issue, he or she would report it and Ash would, in turn, raise the issue with Sam's Club.  (Defs. 56.1 ¶ 25; Ash Dep. Tr. at 89:6-17.) And for his part, Kelly noted that he had never had a problem with Sam's Club's loading practices. (Defs. 56.1 ¶ 26; Kelly Dep. Tr. at 36:9-16.)

---

[4]      Typically, the trailer would have a horizontal bar—supplied by American Paper—locked in place in front of the last row of bales to help secure the load.  (Pl. 56.1 ¶ 17, Kelly Dep. Tr. at 76:5-79:20.)  At his deposition, Kelly could not recall whether he strapped the bar prior to transporting Trailer 3263 on May 29, 2015. (Pl. 56.1 ¶ 17; Kelly Dep. Tr. at 106:6-9.)

Conversely, Uzhca's co-worker, Cesar Javier, recalled sometimes seeing trailers with bales that were "not leveled," "misleveled," or "unstable." (Javier Dep. Tr. at 66:20-25.) He further explained, depending on who was driving or the conditions of the roads, "some of those bales could be straight" but "sometimes they flip over" or are "on the side." (Defs. 56.1 ¶ 27; Javier Dep. Tr. at 67:10-15.) Nevertheless, Javier clarified that he ultimately did not know how the bales got to be in this condition. (Javier Dep. Tr. at 67:16-24.)

### C. Expert Opinions on Proper Bale Loading and Securing Practice

Rugemer has opined that Sam's East is a shipper of cardboard bales that should have followed the standards set by the Institute of Scrap Recycling Industries, Inc. ("ISRI"). (*See* O'Connor Aff. Ex. K ("Rugemer Report") at 3-6; Rugemer Dep. Tr. at 26:13-29:23.) Rugemer further testified that, regardless of whether Sam's East received a copy of the guidelines, the guidelines were "easily researchable" and it was incumbent on Sam's East to "understand the proper way to ship [] recycled bales." (*See* Pl. 56.1 ¶ 33; Rugemer Dep. Tr. at 29:2-23.) Of note, Defendants' expert, Christopher Ferrone ("Ferrone"), generally agreed with ISRI's guidance. (Pl. 56.1 ¶ 39; Kremins Aff. Ex. F ("Ferrone Dep. Tr.")[5] at 279:13-19.)

According to ISRI's safe shipping guidance, it is acceptable to stack three bales on top of each other while loading a trailer, but this does not apply to the last row of bales next to the trailer's door. (O'Connor Ex. M at 6.) Instead, for this last row, "[b]ales *MUST* be no more than 2 high and turned lengthwise with the length of the trailer."[6] (*Id.* at 8 (emphasis in original); *see also* Rugemer Report at 4.) Drawing on these guidelines, Rugemer determined that, by loading the last

---

[5]    A complete transcript of the Deposition of Christopher Ferrone is attached as Exhibit B to the Reply Affidavit of Patricia O'Connor. (ECF No. 68-2.)

[6]    Although Caminade appeared to agree that the ISRI guidance shown to him during his deposition contained standards for safe shipping (Pl. 56.1 ¶ 12), there is also indication from his testimony that he had not previously seen the ISRI guidelines and/or was not aware of their applicability in or around May 2015. (*See* Caminade Dep. Tr. at 102:10-23, 114:8-15.)

row of bales three high, "Sam[']s Club failed to follow industry recognized best practices for safe loading of cardboard bales into a truck trailer."  (Defs. 56.1 ⁋ 34; Pl. 56.1 ⁋ 35; Rugemer Report at 6; Rugemer Dep. Tr. at 34:5-11.)  Accordingly, Rugemer concluded, Defendants' method of loading cardboard bales created a "dangerous condition."  (Rugemer Report at 6.)

In contrast, Ferrone opined that the bales were "placed properly" and that it was on the "motor carrier" to ensure proper securement.  (Ferrone Dep. Tr. at 301:9-20.)  He further countered that the loading method contemplated by ISRI's guidance was simply "an option" that was not needed if the bales had already been secured.  (*Id.* at Tr. 241:24-242:10.)  Rather, as he explains, there are "different means" for placing and securing cargo.  (*Id.* at Tr. 243:21-244:16.)

## LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). Thus, summary judgment will not lie where there is a "dispute[] over facts that might affect the outcome of the suit under the governing law" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The Supreme Court has made clear that 'at the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter[.]'"  *Westinghouse Elec. Corp. v. N.Y.C. Trans. Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249).  Rather, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.  In deciding a motion for summary judgment, courts must "constru[e] the evidence in the light most favorable to the non-moving party

and draw[] all reasonable inferences in its favor." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal citation and quotations omitted).

The moving party bears the initial burden of pointing to evidence in the record "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by showing "that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (internal citation and quotation marks omitted).

The party asserting that a material fact is genuinely disputed must support his or her assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). In addition, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252.

## DISCUSSION

Moving Defendants set forth several arguments in support of their motion for summary judgment. Preliminarily, Moving Defendants contend that (1) Plaintiff's expert report has failed to establish any industry standard that Defendants had failed to follow and therefore (2) any *ipse dixit* statement that ISRI's safe shipping guidance is an industry standard is unreliable. (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs. Mot."), ECF No. 64, at 4.) In any event,

Moving Defendants maintain that, as a matter of law, they cannot be liable for Plaintiff's injury. To this end, Moving Defendants first contend that, as shippers, they are only liable for any latent defect in their loading, and that any loading issue was open and obvious to Plaintiff.  (*Id.* at 6-8.) They separately contend that, because Plaintiff opened the rear doors of the trailer despite knowing the position of the bales therein, he is the sole proximate cause for his injuries.  (*Id.* at 8-9.)

Plaintiff opposes each contention.  *First*, he argues that Rugemer's opinion that the ISRI's guidance sets forth an industry standard is supported by record.  (Pl.'s Mem. of Law in Opp. to Summ. J. ("Pl. Opp."), ECF No. 66, at 6.)  *Second*, he maintains that a question of fact exists as to whether any defect in loading was patent or latent, thereby precluding a determination of Defendants' breach of duty as a matter of law.  (*Id.* at 8-11.)  *Finally*, he argues that the issue of proximate cause in this case is best left to the jury.  (*Id.* at 11-15.)

The Court will first consider Defendants' challenge to Rugemer's opinion.  It will then turn to the two substantive positions advanced in support of Defendants' motion.

## I.     Rugemer's Reliance on ISRI's Safe Shipping Guidance

Moving Defendants attack the reliability of Rugemer's contention that ISRI's safe shipping guidance is the industry standard governing their conduct.  (Defs. Mot. 4.)  In making this challenge, Moving Defendants have expressly reserved any challenge to Rugemer's qualifications and/or credentials.  (*Id.*)  As Moving Defendants only focus on the reliability of Rugemer's use of ISRI's guidance, the Court's analysis will solely focus on this aspect of his opinion and report.

In general, Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under Rule 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if four conditions are met: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or data";

(3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. This rule imposes a "gatekeeping" function upon courts, meaning that courts must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Even so, the standard for admissibility under Rule 702 is "liberal" and represents "a more permissive approach to expert testimony." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). "[R]ejection of the expert testimony is the exception rather than the rule." *Nemes v. Dick's Sporting Goods, Inc.*, No. 17-cv-1688 (NSR), 2019 WL 3982212, at *5 (S.D.N.Y. Aug. 23, 2019) (internal citation omitted).

After assessing relevance, courts, in fulfilling their gatekeeping function, "must determine 'whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001)). Courts "should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Amorgianos*, 303 F.3d at 265). In other words, "the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Amorgianos*, 303 F.3d at 265-66 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

The Court concludes that Rugemer's application of ISRI's safe shipping guidance as an industry standard is sufficiently reliable for purposes of this motion.  As is relevant here, Rugemer's report maintains that Sam's Club failed to follow recognized industry standards with regard to the safe loading of cardboard bales into truck trailers.  (Rugemer Report at 6.)  Rugemer's analysis comes after a review of the deposition testimony of Plaintiff, Ash, and Cesar Javier and discovery materials from the parties, which ultimately described Plaintiff's accident and Defendants' loading practices.  (*Id.* at 2-3.)  Rugemer then applied what he contends was an industry standard at the time of the accident, which he derived from ISRI's *Safe Shipping - ISRI/AF&PA Shipping Guide*, to his review of this testimony and discovery material.  (*Id.* at 3.)

Rugemer testified that it was his understanding that ISRI is a "trade group that issues best practices on the generation and shipping and handling of recycled materials," like the cardboard bales at issue in this case.  (*See* Rugemer Dep. Tr. at 25:18-21.)  To that end, ISRI describes itself as a private, non-profit trade association that "provides expert insight on key issues relevant to scrap recyclers and the communities they serve."  *See* ISRI, *News & Publications – Latest News Releases*, ISRI.org, https://www.isri.org/news-publications (last accessed Sept. 1, 2020).  Among other things, they provide "Recommended Safety Practices" for "Transportation Safety" that focuses on "transportation safety within the scrap recycling industry."  ISRI, *Safety – Recommended Safety Practices*, ISRI.org, https://www.isri.org/safety (last accessed Sept. 1, 2020).  Notably, Defendants' expert concurred that, at the very least, the loading guidelines promulgated by ISRI depict acceptable loading options for shippers.[7]  (Ferrone Dep. Tr. at 279:13-19.)  Taken together, the Court finds that Rugemer's identification of ISRI's guidance was far from

---

[7]     To be sure, Ferrone also testified that the decision to place the bales two high was an option that would not be needed if the load had already been secured.  (Ferrone Dep. Tr. at 241:24-242:10.)  This position is ultimately relevant to whether the ISRI guidance was the applicable standards in this case, but it does not indicate that Rugemer's application of the ISRI guidance was unreliable.

an *ipse dixit* statement, and it was appropriate for Rugemer to apply the facts of this case to this standard promulgated by a trade group.

Moving Defendants nevertheless contend that Rugemer's opinion lacks reliability because it does not establish that the ISRI guidance is actually applicable to them. (Defs. Mot. 4-5.) To this end, as Defendants aptly note, Rugemer, during his testimony, acknowledged that he was unaware whether Defendants were members of ISRI or whether ISRI provided its guidance directly to Defendants. (Rugemer Dep. Tr. at 26:2-7, 29:5-12.) Rather, Rugemer's basis for imputing ISRI's standards to Defendants is that it is "common for a shipper to research and adopt safe and proper methods to ship their goods" and that it was ultimately Defendants' "duty to research the proper way to ship their goods." (*Id.* at Tr. 26:13-27:22, 29:17-23.)

Although there may be a basis to question the applicability of ISRI's safe shipping guidance to Defendants, this issue is best left to the jury. Put differently, the question of whether ISRI's guidance constitutes an industry standard is a disputed material fact that is relevant to the ultimate determination of Defendants' liability. *See Mathis-Kay v. McNeilus Truck & Mfg., Inc.*, No. 06-CV-815S, 2011 WL4498386, at *6 (W.D.N.Y. Sept. 27, 2011) (concluding that "[w]hether Defendants complied with ANSI standards, whether those standards are recognized in the refuse collection industry, and whether compliance with those standards is sufficient to shield a product from being defective are all questions disputed by the parties that are relevant to a determination of Defendants' liability"); *Rupolo v. Oshkosh Truck Corp.*, 749 F. Supp. 2d 31, 43 (E.D.N.Y. 2010) (concluding that "it should be for the fact-finder to determine whether Dr. Ojalvo's reliance on the ANSI and OSHA standards is appropriate").

Defendants' reliance on *Almonte v. Averna Vision & Robotics, Inc.*, 128 F. Supp. 3d 729 (W.D.N.Y. 2015), does not compel a different conclusion. In *Almonte*, the court considered the

reliability of plaintiff's expert's reliance on OSHA regulations as the industry standard for whether a product was defectively designed. 128 F. Supp. at 742. The court in turn rejected the expert's reliance on these regulations, explaining that the expert "blithely cited Defendant's violation of the OSHA regulation without anchoring it to any indication that the regulation accurately reflect[ed] the industry standard that existed at the time." *Id.* at 744. Critically, however, the court's conclusion was informed by the fact that, under New York law, OSHA regulations are typically "not applicable in products liability actions against manufacturers." *Id.* at 742-43. Given this fact, and in the absence of any evidence showing that the OSHA regulations were being relied upon by defendant at the time of manufacturing its product, the court concluded that plaintiff's expert's methodology underlying his opinion should be rejected as unreliable. *Id.* at 744. In so holding, the court keenly recognized that "[u]sually, when there is a factual question about the applicability of two competing industry standards, it is for the fact-finder to determine which standard applies." *Id.* at 744 (citing *Rupolo*, 749 F. Supp. 2d at 43).

Here, conversely, Rugemer has identified guidelines that relate to the loading of the specific category of materials at issue in this case—to wit, cardboard bales. Moreover, there is some evidence, even if minimal, that these standards presented a recognized/viable loading method for shippers. In the absence of any identified authority expressly indicating that the ISRI guidance is not to be used as an industry standard governing entities like Defendants (as was the case in *Almonte*), the question of whether these guidelines govern Defendants' conduct should be for a jury to decide. Accordingly, the Court will decline to preclude Rugemer's report on the basis that it applied ISRI's guidance as an industry standard.

## II. Plaintiff's Negligence Claim

Under New York law, "a plaintiff must establish three elements to prevail on a negligence claim: '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and

(3) injury to the plaintiff as a result thereof.'" *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981)); *see also McCarthy v. Olin Corp.*, 119 F.3d 148, 161 (2d Cir. 1997) ("To state a cause of action for negligence, the plaintiffs must show: (1) that Olin owed them a 'duty, or obligation, recognized by law', (2) a breach of the duty, (3) a 'reasonably close causal connection between [defendant's] conduct and the resulting injury' and (4) loss or damage resulting from the breach."). In contending that Plaintiff's negligence claim fails as a matter of law, Moving Defendants lodge two primary arguments. *First*, they maintain that, to the extent any duty existed between Plaintiff and Defendants, that duty only extended to any latent defects in their loading. (Defs. Mot. 6-8.) *Second*, Defendants aver that Plaintiff's own conduct was the sole proximate cause of his injuries. (*Id.* at 8-9.) The Court considers each argument in turn.

### A. Duty of Care

"The question of the existence and scope of an alleged tortfeasor's duty 'is, in the first instance, a legal issue for the court to resolve.'" *Alfaro*, 210 F.3d at 114 (quoting *Waters v. N.Y.C. Hous. Auth.*, 69 N.Y.2d 225, 229 (1987)). Courts will consider the "reasonable expectation of the care owed and the basis for the expectation and the legal imposition of a duty." *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 585 (1994) (citing *Turcotte v. Fell*, 68 N.Y.2d 432, 437 (1986)). To this end, Defendants maintain that, under New York law, any applicable duty it had to Plaintiff is limited by the rule articulated in *United States v. Savage Truck Line, Inc.*, 209 F.2d 442 (4th Cir. 1954). (Defs. Mot. 6-8.)

In *Savage*, the Fourth Circuit held that, while "[t]he primary duty as to the safe loading of property is [] upon the carrier,"

[w]hen the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be

> discerned by ordinary observation by the agents of the carrier; but if the improper
> loading is apparent, the carrier will be liable notwithstanding the negligence of the
> shipper.

*Savage*, 209 F.2d at 445.  Although the *Savage* court's holding pertained to the issue of indemnity

for damaged goods, several other circuits have since adopted or recognized the *Savage* Rule as

setting forth the requisite duty of care in state common-law negligence cases.  *See, e.g.*, *Vago-*

*Schaper v. Weyerhaeuser Co.*, 619 F.3d 845, 848-49 (8th Cir. 2010) (concluding, under Minnesota

law, that the *Savage* Rule created a duty of care "to prevent latent loading defects"); *Spence v.*

*ESAB Grp., Inc.*, 623 F.3d 212, 220-22 (3d Cir. 2010) (recognizing, under Pennsylvania law, that

"a shipper may have liability when an accident results from movement of goods during transport

if the shipper created a non-apparent condition that caused the load to shift").

Neither the Second Circuit nor the New York Court of Appeals have commented on

whether the *Savage* Rule establishes a shipper's duty for negligence claims under New York law.

However, at least one New York intermediate appellate court and one court in this district have

recognized its applicability in the context of indemnity and comparative fault suits related to

damage goods.  *See, e.g.*, *Instrument Sys. Corp. v. Assoc. Rigging and Hauling Corp.*, 70 A.D.2d

529, 530-31 (1st Dep't 1979) (concluding that a factual issue existed as to whether a shipper was

negligent in its loading and whether any defect was latent); *Ebasco Servs., Inc. Pac. Intermountain*

*Express Co.*, 398 F. Supp. 565, 567 (S.D.N.Y. 1975) (denying motion for summary judgment

because an issue of fact existed as to whether a defect was latent or patent, where defendant sought

indemnification for damage to property).  Moreover, at least one court in this circuit has held that

the *Savage* Rule establishes the requisite duty of care in negligence actions under New York law.

*See Zwolak v. Phoenix Steel Serv., Inc.*, No. 12-CV-00910F, 2015 WL 5971128, at *7 (W.D.N.Y.

Oct. 14, 2015) (recognizing that "under both New York law . . . and federal law, as stated

in *Savage*, [a] carrier can be held liable for an obvious or apparent defect in loading" in a personal

injury suit).  *But see Yoos v. Better Life Tech., LLC*, No. 1:09-CV-0660 (LEK/DRH), 2012 WL 177867, at *4 (N.D.N.Y. Jan. 23, 2012) (rejecting defendant's contention that if it did owe a duty of care, it was limited to "preventing defects in the loading that were concealed or latent" because the cases applying the *Savage* rule merely "addresse[d] the allocation of comparative liability following a finding of negligence, not the existence or scope of a defendant's preexisting duty").

Here, Plaintiff does not appear to seriously challenge whether the *Savage* Rule represents the applicable duty of care that Defendants owed to Plaintiff under New York law.  (*See* Pl. Opp. 8-11.)  Instead, Plaintiff argues that, if the *Savage* Rule does apply, a question of fact exists as to whether this duty was breached, *i.e.*, whether the loading at issue was a latent or patent defect. (*Id.*)  Moving Defendants, conversely, argue that any purported "defect" in its loading was obvious to Plaintiff.  (Defs. Mot. 7.)  Assuming, without deciding, that the method of loading the cardboard bales was improper and that the *Savage* Rule sets forth the requisite duty of care, the Court concludes that there is a question of fact about whether any purported defect was readily apparent to Plaintiff.

To be sure, there is no dispute in the record regarding how Plaintiff opened the doors of the trailer and what he saw therein.  As testimony confirms, Plaintiff first opened the right-hand door, and saw that the top bundle of cardboard was "touching the top" of the left door, while the bottom bundle was four inches from the door.  (Uzhca Dep. Tr. at 62:21-65:10.)  Plaintiff further testified that that this configuration did not look any different than in the past, and that the contents of the trailer "always c[a]me[] like that."  (Uzhca Dep. Tr. at 62:25-63:5, 65:4-10.)  Still, "the fact that a condition is open and obvious does not entail that the *defect* in that condition is open and obvious."  *Yoos*, 2012 WL 177867 at *5 (holding that "[w]hile parties do not dispute that the cargo in Plaintiff's cargo container had not been secured by means of straps or bars or other restraints,

the question of whether the lack of restraints was a patent or latent defect remains open"); *see also Franklin Stainless Corp. v. Marlo Transp. Corp.*, 748 F.2d 865, 868-69 (4th Cir. 1984) (explaining that while a condition was "open and obvious," it did not follow that the "defect in this manner of loading was open and obvious").  And, although Plaintiff did have experience with opening trailer doors in the past (Uzhca Dep. Tr. at 66:10-24), it is not clear from the record whether a person in Plaintiff's position, whose job responsibility was simply to move trailers and open their doors prior to docking (*see id.* at Tr. 25:15-19, 33:12-25, 34:6-10), would have noticed that there was any issue with the load or its securement.  *See Ebasco*, 398 F. Supp. at 568-69 (explaining that although a defect may have been observable to the naked eye, it was not necessarily readily apparent and, in turn, depended on the experience of the observer, thus precluding a finding, as a matter of law, that the defect was a patent defect).

Ultimately, whether Plaintiff should have been aware of an issue with the loading, and thus whether any duty was breached, is a question of fact best left to the jury.  *See Instrument Sys. Corp.*, 70 A.D.2d at 531.  The Court DENIES Moving Defendants' motion for summary judgment under the *Savage* Rule.

### B.  Proximate Causation

Under New York law, "[t]o carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury."  *Howard v. Poseidon Pools, Inc.*, 72 N.Y.2d 972, 974-75 (1988) (quoting *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315 (1980)).  "Proximate cause is almost invariably a factual issue."  *Haibi v. 790 Riverside Drive Owners, Inc.*, 156 A.D.3d 144, 147 (1st Dep't 2017).  Thus, "[g]enerally[] it is for the trier of fact to determine the issue of proximate cause."  *Reece v. J.D. Posillico, Inc.*, 164 A.D.3d 1285, 1288 (2d Dep't 2018) (quoting *Kalland v.*

*Hungry Harbor Assocs., LLC*, 84 A.D.3d 889, 889 (2d Dep't 2011)).  "However, the issue of proximate cause may be decided as a matter of law where only one conclusion may be drawn from the established facts."  *Victor v. Daley*, 150 A.D.3d 1307, 1307 (2d Dep't 2017) (internal citations and quotations omitted).

Here, the record is clear regarding what procedures Plaintiff was required to follow when opening the trailer's doors.  As several witnesses testified, the best practices include first opening the right-hand door to inspect the load, and then upon confirming that nothing was "hanging" or had "shifted," the left-hand door could be opened.  (Kelly Dep. Tr. 42:20-43:22; O'Neill Dep. Tr. at 121:22-122:22.)  The record is also clear that this was generally the manner by which Plaintiff opened the rear doors of the trailer prior to his accident.  (Uzhca Dep. Tr. at 60:3-61:7, 67:6-68:23.)  Furthermore, there is no real dispute that, prior to opening the left-hand door, Plaintiff had observed the top cardboard bale "touching the door" upon his initial observation of the load.  (*Id.* at Tr. 64:9-65:10.)  For this reason, Moving Defendants contend, Plaintiff is the sole proximate cause for his injuries, thereby entitling them to summary judgment.  (Defs. Mot. 8-9.)

The Court disagrees.  To begin, as previously explained, there are questions of fact as to whether Defendants' loading practices created a risk by not following ISRI's guidance and, if so, whether that risk was patent to Plaintiff.  The reasons militating against summary judgment on these issues ring equally true as to proximate causation.  Moreover, a material dispute exists regarding whether Plaintiff had reason to know, or should have foreseen, that opening the left-hand door would result in the bales falling out.  Although Plaintiff does repeatedly state that the top cardboard bale was "touching" or "against" the door, with all reasonable inferences drawn in Plaintiff's favor and the evidence construed in a light most favorable to him, a reasonable jury could conclude that Plaintiff did not have a reason to know that the bales would come crashing out

of the trailer if the left-hand door was opened.  (*Cf.* Rugemer Dep. Tr. at 43:11-24 (noting that

Plaintiff's testimony does not indicate that "something [was] leaning" against the door or that the

door was bulging).)  Indeed, Plaintiff had testified that the contents of the trailer "always c[a]me[]

like that" and that he was not concerned (Uzhca Dep. Tr. at 65:4-10, 66:16-67:5), which provides

a stark contrast to Defendants' contention that "[b]y all accounts" he should have "advised

someone of the situation" (Defs. Mot. 8-9).

At bottom, multiple conclusions could be drawn based on the record regarding proximate

causation.  Accordingly, the Court DENIES Moving Defendants' motion for summary judgment

dismissing Plaintiff's claim on this basis.

## CONCLUSION

For the foregoing reasons, Moving Defendants' motion for summary judgment is

DENIED.  The parties are directed to appear for a pretrial conference on October 22, 2020 at 11:30

am.

The Clerk of Court is directed to terminate the motions at ECF No. 63.

Dated:    September 14, 2020
         White Plains, New York

SO ORDERED:

NELSON S. ROMÁN
United States District Judge