USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3/15/2023_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LUIS UZHCA and MARIA SMITH,

                              Plaintiffs,


        -against-


WAL-MART STORES, INC., SAM'S EAST, INC.
and INLAND-GREENBURGH DELAWARE
BUSINESS TRUST,

                              Defendants.

17 Civ. 3850 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiffs Luis Uzhca ("Uzcha") and Maria Smith ("Smith") (collectively, "Plaintiffs") commenced this diversity personal injury action against Defendants Wal-Mart Stores, Inc. ("Walmart"), Sam's East, Inc. ("Sam's East"), and Inland-Greenburgh Delaware Business Trust ("IGDBT") (collectively, "Defendants") on May 22, 2017. (ECF No. 1.) A jury trial, originally scheduled for October 12, 2022, has been adjourned *sine die*. (ECF No. 191.)

Presently before the Court are the parties' motions in limine (ECF Nos. 164, 165, 166, 167, 168, 169) and Defendants' motion for sanctions (ECF No. 195). The motions are resolved as follows:

(1) Defendants' motion at ECF No. 164 is DENIED;

(2) Defendants' motion at ECF No. 165 is GRANTED IN PART, DENIED IN PART;

(3) Defendants' motion at ECF No. 166 is DENIED;

(4) Plaintiffs' motion at ECF No. 167 is GRANTED IN PART, DENIED IN PART;

(5) Plaintiffs' motion at ECF No. 168 is GRANTED IN PART, DENIED IN PART;

(6) Plaintiffs' motion at ECF No. 169 is GRANTED IN PART, DENIED IN PART; and

(7) Defendants' motion at ECF No. 195 is GRANTED IN PART, DENIED IN PART.

# BACKGROUND

## I. Facts

The following undisputed facts are drawn from the record.

### A. Uzhca's Accident

Uzhca was an employee of Sani-Pro Disposal Services Corp. and had been assigned to work at the American Independent Paper Mills Supply Company, Inc. ("American Paper"), located at 15 S. Depot Plaza, Tarrytown, New York.  (Compl. ⁋ 14.)  Sam's East is the operator of the Sam's Club in Elmsford, New York ("Sam's Club"), and Wal-Mart is, indirectly, the parent company of Sam's East.  (Defs.' Local Rule 56.1 Statement ("Defs. 56.1"), ECF No. 65, at n.3; Compl. ⁋⁋ 11-12; Aff. of Patricia O'Connor ("O'Connor Aff."), ECF No. 65-15, Ex. B at 1.)

While working at American Paper, Uzhca was responsible for getting truck cabs, securing them to one of approximately 10 or 11 trailers parked onsite, and moving the chosen trailer to within eight to ten feet of the loading dock.  (Defs. 56.1 ⁋ 2; O'Connor Aff. Ex. D ("Uzhca Dep. Tr.") at 27:11-33:11, 52:10-19.)  Once a trailer was about eight to ten feet away from the loading dock, Uzhca would open its rear doors and then finish backing it into the loading dock.  (Uzhca Dep. Tr. at 34:6-35:6.)  Uzhca had done this type of work approximately 40 to 50 times prior to the date of his accident.  (Defs. 56.1 ⁋ 2; Uzhca Dep. Tr. at 66:10-15.)

On May 29, 2015, at approximately 10:00 a.m., Uzhca's supervisor, Winston Ash ("Ash"), identified a trailer that he wanted Uzhca to move to the loading dock.  (Defs. 56.1 ⁋ 3; Uzhca Dep. Tr. at 36:3-19, 51:5-19.)  The trailer, which is identified by the number 3263 ("Trailer 3263") contained bales of cardboard that had been delivered from Sam's East.  (Pl.'s Rule 56.1 Statement ("Pl. 56.1"), ECF No. 66-15, ⁋⁋ 14, 21; O'Connor Aff. Ex. E ("Ash Dep. Tr.") at 19:19-20:6, 36:25-38:4, 41:17-25; O'Connor Ex. H ("Kelly Dep. Tr.") at 29:10-31:18, 33:17-34:6.)

Upon receiving Ash's instruction, Uzhca retrieved the truck cab and backed it into Trailer 3263, causing the two to physically connect. (Defs. 56.1 ⁋ 4; Uzhca Dep. Tr. at 53:4-54:22.) After connecting the truck cab and the trailer, Uzhca got out of the cab to make sure the connection was proper. (Defs. 56.1 ⁋ 5; Uzhca Dep. Tr. at 54:23-55:5.) Uzhca then lifted up the legs of the trailer so that it could be moved. (Defs. 56.1 ⁋ 5; Uzhca Dep. Tr. at 55:22-56:11.) Thereafter, Uzhca backed the trailer into a position approximately eight feet away from the loading dock. (Defs. 56.1 ⁋ 6; Uzhca Dep. Tr. at 56:12-57:5.)

Uzhca again got out of the truck cab and proceeded toward the rear of the trailer. (Defs. 56.1 ⁋ 7; Uzhca Dep. Tr. at 57:19-25.) Uzhca first opened the right-hand door of the trailer and secured it to prevent the door from closing. (Defs. 56.1 ⁋ 8; Uzhca Dep. Tr. at 60:3-61:7.) Upon opening the right-hand door, Uzhca saw the contents of the truck—bales of cardboard weighing between 600 to 900 pounds each. (Uzhca Dep. Tr. at 61:13-62:24, 63:11-19.) Uzhca testified that he saw a bundle of cardboard "touching the top" of the left door, while the bottom bundles were four inches from the door. (Defs. 56.1 ⁋ 10; Uzhca Dep. Tr. at 62:21-65:10.) But Uzhca also testified that the contents of the trailer did not look any different than in the past, and that they "always c[a]me[] like that." (Uzhca Dep. at Tr. 62:25-63:5, 65:4-10.)

After opening and securing the right-hand door, Uzhca proceeded to unlock the left-hand door of the trailer. (*Id.* at Tr. 67:6-10.) At that moment, the cardboard bales fell out of the trailer and caused the left-hand door to swing open and strike Uzhca's chest. (Defs. 56.1 ⁋ 11; Uzhca Dep. Tr. at 67:11-68:2.) Uzhca was knocked to the ground and, after the first two bales fell, he tried to drag himself out of the way. (Uzhca Dep. Tr. at 68:3-12.) As he was moving, the last bale fell out of the trailer, causing Uzhca to lift out his right foot to prevent the bale from crushing him.

(Defs. 56.1 ⁋ 12; Uzhca Dep. Tr. at 68:24-69:24.)  The bale's sheer weight ultimately crushed and broke his foot.  (Uzhca Dep. Tr. at 69:25-70:11.)

### B.  The Recyclable Cardboard Bale Loading and Transportation Process

     i.   *Sam's East's Loading of American Paper's Trailers*

On the date of Uzhca's accident, Sam's East was a customer of American Paper and would use American Paper to move recyclable cardboard from Sam's East's Sam's Club location in Elmsford, New York to American Paper's location in Tarrytown, New York.  (Defs. 56.1 ⁋ 16; Ash Dep. Tr. at 19:19-20:6, O'Connor Aff. Ex. F ("Javier Dep. Tr.") at 22:19-25; O'Connor Aff. Ex. G ("O'Neill Dep. Tr.") at 38:6-39:3.)  The process would begin with an American Paper driver delivering an empty 53-foot trailer to Sam's Club.  (Defs. 56.1 ⁋ 17; *see also* O'Neill Dep. Tr. at 47:15-24, 52:23-54:8.)  At Sam's Club, the empty trailer would eventually be placed in bay seven of the store's loading dock ("Bay Seven"), which was next to Sam's Club's compactor.  (Defs. 56.1 ⁋ 17; O'Neill Dep. Tr. at 67:2-17.)

Sam's Club's employees would compact cardboard boxes together into bales that were approximately 36 inches high and five feet wide.  (Defs. 56.1 ⁋ 17; Pl. 56.1 ⁋ 24, O'Neill Dep. Tr. at 40:16-44:13.)  The bales were then loaded onto the trailer using forklifts.  (Defs. 56.1 ⁋ 17; O'Neill Dep. Tr. at 54:13-55:3.)  As Sam's Club's general manager, Robert O'Neill ("O'Neill"), testified, each trailer was filled to capacity, in part because of cost but also because it created more stability.  (Pl. 56.1 ⁋ 25; O'Neill Dep. Tr. at 55:10-20, 68:8-69:3.)  Ash corroborated this practice during his deposition, noting that trailers were packed until full.  (Defs. 56.1 ⁋ 20; Ash Dep. Tr. at 77:21-78:9; *see also* Aff. of Michael Kremins ("Kremins Aff."), ECF No. 66-1, Ex. A ("Caminade Dep. Tr.") at 39:10-40:7, 54:4-21.)

Sam's Club's employees would load bales onto the trailer from the front of the trailer to the rear, stacking them three high and in one row.  (Pl. 56.1 ¶¶ 4, 25, 28; O'Neill Dep. Tr. at 53:19-55:3, 90:9-13, 103:5-20; Caminade Dep. Tr. at 69:15-73:15.)  When fully stacked, the bales would be within 12 inches of the trailer's ceiling.  (Defs. 56.1 ¶ 21; Pl. 56.1 ¶ 4; Ash Dep. Tr. at 99:6-99:17; Caminade Dep. Tr. at 71:21-72:13.)  There would only be a limited amount of space on either side of the stacked row, making it too small of a space for a person to access.  (Pl. 56.1 ¶ 28; O'Neill Dep. Tr. at 119:18-120:512.)  If the loaded materials were tilting in anyway, a forklift operator would remove those bales and restack them in the trailer.[1]  (Defs. 56.1 ¶ 23; Pl. 56.1 ¶ 27; O'Neill Dep. Tr. at 90:14-24; *see also* Caminade Dep. Tr. at 76:19-77:8.)

Walter Caminade, a former Sam's Club employee whose duties included loading cardboard bales into trailers, testified that Sam's Club did not use any tying or tethering device or straps (also known as low bars) to secure the cardboard bales.  (Pl. 56.1 ¶ 7; Caminade Dep. Tr. at 80:8-23.)  Caminade further testified that, when loading the bales on to the trailer, Sam's Club did not use anti-skid or anti-slipping sheets.  (Pl. 56.1 ¶ 10; Caminade Dep. Tr. at 104:16-105:11.)  However, in terms of securing the load, Plaintiff's expert, Brooks Rugemer ("Rugemer"), testified that the enclosed trailers—the kind into which Sam's Club cardboard bales were loaded—did not require the same level of securement as open flatbed trailers.  (Defs. 56.1 ¶ 32; Pl. 56.1 ¶ 34; O'Connor Aff. Ex. L ("Rugemer Dep. Tr.") at 31:2-22.)  More specifically, Rugemer testified that "cargo that's within an enclosed box trailer does not need additional load securement" because "freight within a closed trailer that's loaded next to freight and next to the walls is considered secure and no other devices are required."  (Defs. 56.1 ¶ 32; Rugemer Dep. Tr. at 57:4-58:6, 64:12-25.)

ii.    *American Paper's Transportation of Loaded Trailers*

---

[1]    O'Neill visually inspected the loaded materials "[a] few times a day" by looking for whether "something was either tilting or something as not straight" in the load.  (O'Neill Dep. Tr. at 87:21-89:22.)

Once a trailer was almost full, Sam's Club would call American Paper to schedule a pickup. (Defs. 56.1 ¶ 17; Ash Dep. Tr. at 12:9-14; Javier Dep. Tr. at 12:11-18; O'Neill Dep. Tr. at 53:25-54:4.) American Paper would, in turn, send a driver to bring another empty trailer to Sam's Club. (Defs. 56.1 ¶ 18; O'Neill Dep. Tr. at 69:4-10.)  The driver would unhook the empty trailer upon arrival at Sam's Club and then hook the truck cab to the full trailer at Bay Seven.  (Defs. 56.1 ¶ 18; O'Neill Dep. Tr. at 69:24-70:6.)  The driver would pull the full trailer about 60 to 80 feet away from the loading docks—going over a storm water drain and with the trailer's rear doors open— and park it on the side of the building.  (O'Neill Dep. Tr. at 71:14-72:6, 72:21-74:19, 76:18-24.)

After pulling out the trailer, the driver would inspect the load to make sure it was safe for travel.  (Defs. 56.1 ¶ 18; Pl. 56.1 ¶ 15; O'Connor Aff. Ex. H ("Kelly Dep. Tr.") at 18:21-25, 36:17-37:12)  The driver did so because, while it was Sam's Club's responsibility to load the trailer correctly and safely (Pl. 56.1 ¶ 22; Ash Dep. Tr. at 91:16-18, 118:15-22), it was ultimately "required by law" that American Paper's driver make sure that the trailer was properly loaded and safe to transport.  (Defs. 56.1 ¶ 30; Kelly Dep. Tr. at 37:9-12; Ash Dep. Tr. at 15:13-16:23, 91:18-21.)  As explained by Brian Kelly, a former American Paper driver who was responsible for transporting Trailer 3263 on May 29, 2015, drivers were to make sure that the load was secure, nothing was "hanging there," and a safety bar was set in place.  (Defs. 56.1 ¶ 30; Pl. 56.1 ¶¶ 14-15; Kelly Dep. Tr. at 19:17-25.)  To this end, although he confirmed that the space inside the trailer was too tight for a driver to climb or walk into, Kelly testified that drivers could at least evaluate whether the bales "were even" and that "nothing was rocking."[2]  (Pl. 56.1 ¶¶ 16-17; Kelly Dep. Tr. at 71:10-73:9; *see also* Ash Dep. Tr. at 94:6-11, 120:10-12 ("The way to observe [the load] is

---

[2]     Typically, the trailer would have a horizontal bar—supplied by American Paper—locked in place in front of the last row of bales to help secure the load.  (Pl. 56.1 ¶ 17, Kelly Dep. Tr. at 76:5-79:20.)  At his deposition, Kelly could not recall whether he strapped the bar prior to transporting Trailer 3263 on May 29, 2015. (Pl. 56.1 ¶ 17; Kelly Dep. Tr. at 106:6-9.)

to check how far it is from the edge of the trailer, and to make sure that they're stacked up and down, or . . . straight.")).  If the cardboard bales were not properly loaded, the driver would not take the load until it was fixed.  (Defs. 56.1 ⁋ 29; Ash Dep. Tr. at 94:17-95:8.)

After the check was complete, the driver would close the trailer's doors and drive to American Paper.  (Defs. 56.1 ⁋ 18; Kelly Dep. Tr. at 17:17-19:2.)  The distance from Sam's Club to American Paper was approximately five miles and the drive would take 10 minutes.  (Defs. 56.1 ⁋ 18; Kelly Dep. Tr. at 107:13-18.)  The drive required the cab and trailer to go down some hills. (Defs. 56.1 ⁋ 18; Kelly Dep. Tr. at 107:24-108:4.)

    *iii.*   *Deponents Prior Experiences with Sam's Club's Bale Loads*

Although none witnessed Uzhca's accident, several individuals have testified regarding their prior experiences with Sam's Club's cardboard bale loads.  For example, O'Neill has testified that, over the course of seeing approximately 50 American Paper trailers being pulled away from Sam's Club's loading dock, he never observed any of the bales inside the trailers move.  (Defs. 56.1 ⁋ 23; O'Neill Dep. Tr. at 76:4-78:7.)  Similarly, Ash testified that he did not recall any issues with Sam's Club's trailers, but noted that, if a driver saw an issue, he or she would report it and Ash would, in turn, raise the issue with Sam's Club.  (Defs. 56.1 ⁋ 25; Ash Dep. Tr. at 89:6-17.) And for his part, Kelly noted that he had never had a problem with Sam's Club's loading practices. (Defs. 56.1 ⁋ 26; Kelly Dep. Tr. at 36:9-16.)

Conversely, Uzhca's co-worker, Cesar Javier, recalled sometimes seeing trailers with bales that were "not leveled," "misleveled," or "unstable."  (Javier Dep. Tr. at 66:20-25.)  He further explained, depending on who was driving or the conditions of the roads, "some of those bales could be straight" but "sometimes they flip over" or are "on the side."  (Defs. 56.1 ⁋ 27; Javier

Dep. Tr. at 67:10-15.)  Nevertheless, Javier clarified that he ultimately did not know how the bales

got to be in this condition.  (Javier Dep. Tr. at 67:16-24.)

### C.  Expert Opinions on Proper Bale Loading and Securing Practice

Rugemer has opined that Sam's East is a shipper of cardboard bales that should have

followed the standards set by the Institute of Scrap Recycling Industries, Inc. ("ISRI").  (*See*

O'Connor Aff. Ex. K ("Rugemer Report") at 3-6; Rugemer Dep. Tr. at 26:13-29:23.)  Rugemer

further testified that, regardless of whether Sam's East received a copy of the guidelines, the

guidelines were "easily researchable", and it was incumbent on Sam's East to "understand the

proper way to ship [] recycled bales."  (*See* Pl. 56.1 ₱ 33; Rugemer Dep. Tr. at 29:2-23.)  Of note,

Defendants' expert, Christopher Ferrone ("Ferrone"), generally agreed with ISRI's guidance.

(Pl. 56.1 ₱ 39; Kremins Aff. Ex. F ("Ferrone Dep. Tr.")[3] at 279:13-19.)

According to ISRI's safe shipping guidance, it is acceptable to stack three bales on top of

each other while loading a trailer, but this does not apply to the last row of bales next to the trailer's

door.  (O'Connor Ex. M at 6.)  Instead, for this last row, "[b]ales *MUST* be no more than 2 high

and turned lengthwise with the length of the trailer."[4]  (*Id.* at 8 (emphasis in original); *see also*

Rugemer Report at 4.)  Drawing on these guidelines, Rugemer determined that, by loading the last

row of bales three high, "Sam[']s Club failed to follow industry recognized best practices for safe

loading of cardboard bales into a truck trailer."  (Defs. 56.1 ₱ 34; Pl. 56.1 ₱ 35; Rugemer Report

at 6; Rugemer Dep. Tr. at 34:5-11.)  Accordingly, Rugemer concluded, Defendants' method of

loading cardboard bales created a "dangerous condition."  (Rugemer Report at 6.)

---

[3]   A complete transcript of the Deposition of Christopher Ferrone is attached as Exhibit B to the Reply Affidavit of Patricia O'Connor.  (ECF No. 68-2.)

[4]   Although Caminade appeared to agree that the ISRI guidance shown to him during his deposition contained standards for safe shipping (Pl. 56.1 ₱ 12), there is also indication from his testimony that he had not previously seen the ISRI guidelines and/or was not aware of their applicability in or around May 2015.  (*See* Caminade Dep. Tr. at 102:10-23, 114:8-15.)

In contrast, Ferrone opined that the bales were "placed properly" and that it was on the "motor carrier" to ensure proper securement. (Ferrone Dep. Tr. at 301:9-20.) He further countered that the loading method contemplated by ISRI's guidance was simply "an option" that was not needed if the bales had already been secured. (*Id.* at Tr. 241:24-242:10.) Rather, as he explains, there are "different means" for placing and securing cargo. (*Id.* at Tr. 243:21-244:16.)

## II. Summary Judgment Denied

By Opinion and Order dated September 14, 2020 ("September 14, 2020 Opinion"), this Court denied Defendants' motion for summary judgment. (ECF No. 71.) Specifically, the Court (1) declined to preclude Rugemer's report on bale loading and securing practice; (2) held that whether Plaintiff should have been aware of an issue with the loading is a question of fact best left to the jury; and (3) declined to hold that Plaintiff was the sole proximate cause for his injuries. (*Id.*).

Following the Court's denial of summary judgment, the parties proceeded to complete discovery. A jury trial was scheduled for October 6, 2022, with an alternate date of October 11, 2022. (ECF No. 160.)

## III. Adjournment *Sine Die*

On September 16, 2022, Plaintiff's counsel stunned this Court by revealing—for the first time and during a conference less than three weeks before trial—that Plaintiff sustained additional injury in a motor vehicle accident on or about April 22, 2022 ("the April 2022 accident"). Defendants' counsel reported that they first learned of the April 2022 accident when Plaintiff's counsel sent a drop-box to Defendants' law firm on September 9, 2022. (ECF No. 196.) The drop-box, according to Defendants, contained (1) Plaintiff's medical records from Phelps Memorial Hospital; (2) the Ambulance Call Report for the motor vehicle accident; (3) a HIPPA authorization

addressed to Phelps Memorial Hospital; and (4) copies of an X-ray of Plaintiff's lumbar spine and CT of his cervical spine performed at Phelps Memorial Hospital in relation to the April 22, 2022 accident. (*Id*. at 7.)

Considering Plaintiff's failure to timely disclose the April 2022 accident, which affects his injuries, the Court determines that the parties were not ready to proceed to trial as originally scheduled. (ECF No. 191.) The trial is accordingly adjourned *sine die* to allow time for additional discovery. (*Id*.)

## LEGAL STANDARD

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions in limine." *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)). "The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (quotation omitted). Evidence challenged in a motion in limine "should only be precluded when it is clearly inadmissible on all possible grounds." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) (quotation omitted). Nonetheless, "a court's decision on the admissibility of evidence on a motion in limine may be subject to change when the case unfolds . . . because the actual evidence changes from that proffered by the movant." *Stoncor Grp., Inc. v. Peerless Ins. Co.*, 573 F. Supp. 3d 913, 917–18 (S.D.N.Y. 2021) (citing *Wilder v. World of Boxing LLC*, 220 F. Supp. 3d 473, 479 (S.D.N.Y. 2016)).

**DISCUSSION**

**I.    Securement of Load (ECF No. 164)**

Defendants first seek to preclude any reference to the "securement" of the load, citing Rugemer's statement that enclosed trailers do not require additional securement devices. (ECF No. 164-A).

This Court has closely reviewed and considered Rugemer's statement in denying Defendants' motion for summary judgment. To reiterate, a question of fact exists as to "whether any purported defect [in the loaded bales' condition] was readily apparent to Plaintiff." (ECF No. 71.) The jury shall assess Rugemer's report; it is up to the jury to decide how much weight to be attributed to his testimony. The preclusion of "securement" fetters the jury in its understanding of the bale's condition, which will inevitably hinder the jury's determination of the purported defect question in dispute.

Accordingly, the Court will not preclude any reference to securement at this time.

**II.   Defendants' Wealth, Other Accidents Involving Defendants, and "Reptile Theory" Tactics (ECF No. 165)**

Defendants next seek to preclude testimony regarding (1) Defendants'—in particular, Walmart's—wealth of resources, which include size, financial status, and profits; (2) other accidents, claims, and settlements involving Defendants; and (3) the use of the so-called "Reptile Theory" tactics[5]. (ECF No. 165.) The Court addresses each in turn.

**A.   Defendants' Wealth, Size, Financial Status, and Profits**

---

[5] As one court observed, the Reptile Theory tactic, deriving its name from a 2009 book on plaintiffs' trial strategy in tort cases, "consists of arguing that the appropriate measure of damages is not the amount of harm actually caused in the case, but rather the maximum or cumulative harm that the defendant's alleged conduct could have caused." *Belvin v. Electchester Mgmt., LLC*, No. 17 Civ. 6303(NGG)(MMH), 2022 WL 10586743, at *7 (E.D.N.Y. Oct. 18, 2022) (internal quotation omitted).

Defendants' motion to preclude testimony regarding Walmart's wealth evinces their concern that jurors will be biased toward finding liability as a result due to Walmart's deep pocket. Plaintiffs responded in its opposition that, while they "have no intention of referencing the size of [Defendants] for purposes of claiming deep pockets" (Pl. Opp. at 4, n.1), Defendants' wealth of resources is demonstrative of their experience and knowledge of safety practice in cargo loading and shipment, which is relevant and admissible.

Evidence of "the wealth of a party is never admissible, directly or otherwise, unless in those exceptional cases, where position or wealth is necessarily involved in determining the damages sustained." *Tesser v. Bd. of Educ. of City Sch. Dist. of City of New York*, 370 F.3d 314, 318 (2d Cir. 2004) (internal citations omitted.) Nonetheless, evidence of wealth may "be admitted to impeach the testimony of a witness who 'open[s] the door' to the subject." *Reilly v. Natwest Mkts. Group Inc.,* 181 F.3d 253, 266 (2d Cir.1999) (internal citations omitted). To be admissible, the wealth evidence "must actually be inconsistent with the witness's testimony." *Id.* (citing *United States v.* Hale, 422 U.S. 171, 176 (1975)).

The case at bar is not "exceptional" within the meaning of *Tesser*, 370 F.3d 318-19. Plaintiffs' broad and elusive opposition, based upon speculations such as "[o]ne would expect defendants to have far greater knowledge, experience and expertise . . . than a small mom and pop bodega," fails to identify any relevant ground upon which Defendants' wealth, size, or financial status becomes admissible. (Pl. Opp. at 4.)

Accordingly, the Court grants Defendants' motion to preclude testimony regarding their wealth of resources, including Defendants' size, financial status, or profits. If Defendants' wealth becomes admissible for impeachment purposes during trial, Plaintiffs may move, at that point, for such wealth evidence to be admitted.

### B.  Other Dissimilar Accidents, Claims, and Settlement

Defendants moves to preclude other unrelated accidents, claims, and settlement testimony proffered by Plaintiffs.

It is well settled that "[e]vidence of other accidents is admissible when the conditions surrounding the other accidents are 'substantially similar' to the accident which is the subject of the current litigation." *Bellinger v. Deere & Co.*, 881 F. Supp. 813, 817–18 (N.D.N.Y. 1995) (citing *Jackson v. Firestone Tire & Rubber Co.,* 788 F.2d 1070, 1083 (5th Cir.1986); *Bowen v. Whitehall Labs., Inc.,* 41 F.R.D. 359 (S.D.N.Y.1966); *Sawyer v. Dreis & Krump Mfg. Co.,* 67 N.Y.2d 328, 336 (1986); *Hyde v. County of Rensselaer,* 51 N.Y.2d 927, 929 (1980) (prior accident evidence admissible only upon showing of "substantially the same" conditions)).

Plaintiffs are not permitted to introduce evidence of prior accidents, claims, and settlements where the conditions are not *substantially* similar to that surrounding the instant case. To illustrate, merchandises falling from racks in a retail location of Defendants is not a substantially similar condition, and is thus not admissible. Neither are claims involving expired infant formula.

Accordingly, the Court grants Defendants' motion to preclude unrelated accidents, claims, and settlement that are not *substantially* similar to the instant case.

### C.  "General Safety Rule" and "Reptile Theory Tactic"

Defendants urge the Court to prohibit Plaintiffs' alleged attempt to "establish a general safety rule with which no rational person would disagree" through repetitive questioning.[6]

---

[6] Defendants provided the following example of Plaintiffs' questioning in their brief:

> Q. Do we agree according to good and accepted practices and procedures a warehouse is never allowed to unnecessarily
>
>   expose anyone to harm?
>
> Q. Do we agree according to good and accepted practices and procedures a shipper is never allowed to unnecessarily expose anyone to harm?
>
> Q. I'm going to get into all that later. Right now I'm just asking nice, simple yes/no questions.

Defendants further request that the Court preclude Plaintiffs from employing the Reptile Theory tactic.

A district court is entitled to give attorneys wide latitude in formulating their arguments, *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 271 (2d Cir. 1999), and this Court declines to set a categorical ban on any trial tactics, either reptilian or with respect to the general safety standard. However, Plaintiffs' counsel is sternly forewarned that the Court will not indulge repetitive questions of marginal relevance at any point during trial.

Accordingly, the Court denies Defendants' motion to prohibit Plaintiffs' usage of the Reptile Theory tactic and to preclude Plaintiff's attempt at establishing an unobjectionable general safety standard.

## III.     Dr. Richard Radna, Dr. James Gallina and Plaintiff's Cervical Fusion (ECF No. 166)

Defendants next move to preclude evidence and testimony by Dr. Richard Radna and Dr. James Gallina that Uzcha's cervical fusion was causally related to the May 29, 2015 accident. (ECF No. 166.) The gist of Defendants' argument is that Uzcha did not report any cervical injury following the falling-bale accident in 2015, and that subsequent medical record does not establish that Uzhca's congenital cervical stenosis was traumatically induced. The Court disagrees.

As an initial matter, the Court reminds Defendants that the purpose of a *motion in limine* is not to function as a belated motion for summary judgment.[7] *See Romanelli v. Long Island R.*

---

Q. So the answer to my question was you agree, correct, that according to good and accepted practices and procedures a shipper is never allowed to unnecessarily expose anyone to harm, true?
Q. Do we agree according to the standards of care a shipper is never allowed to unnecessarily expose anyone to harm?
(ECF No. 165-1.)

[7] The Court shares, in earnest, our colleague's sentiment: "I sometimes cannot believe the things that lawyers do. This is not a motion *in limine*. It is a thinly –and not at all cleverly – disguised motion for summary judgment . . ." *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 15 Civ. 6549(CMR)(WL), 2022 WL 3362429, at *2 (S.D.N.Y. Aug. 15, 2022).

*Co.*, 898 F. Supp. 2d 626, 629 (S.D.N.Y. 2012) ("The purpose of a motion in limine is to allow a court to rule on the admissibility of potential evidence in advance of trial.") While Defendants' instant motion purports to exclude Dr. Radna and Dr. Gallina on evidentiary bases, what Defendants truly seek here is a summary denial of the triability of Defendants' cervical condition, which clearly should not have been made in limine at this point.

Second, Defendants fail to establish any valid bases upon which Dr. Richard Radna and Dr. James Gallina should be excluded. Specifically, with respect to Dr. Radna, Defendants assert that his conclusion on the cause of Uzcha's cervical condition was too speculative and unsupported by medical evidence.[8] With respect to Dr. Gallina, Defendants aver that he was Uzcha's treating physician only as to the cervical condition which, according to Defendants, is a pre-existing condition. These arguments lay bare a disputed issue of fact, namely, the scope of Uzcha's injury. (ECF No. 166-7.) This issue will be determined by the trier of facts.[9]

Accordingly, the Court denies Defendants' motion to preclude Dr. Radna and Dr. Gallina in relation to Plaintiff's cervical fusion. Defendants' request for a *Daubert* hearing "outside the presence of the jury and [on the] theories of causal relationship between the accident and Plaintiff's cervical fusion" is also denied. (ECF No. 166-7.) Defendants' motion to dismiss the related damages claims is denied as well.

## IV. Plaintiff's Omnibus Motion (ECF No. 167)

Plaintiff moves to preclude (1) Defendants from offering an apology to the jury for Plaintiffs' injuries; (2) any evidence concerning Plaintiffs' financial status; (3) the statement "anyone can file a lawsuit"; (4) any statement or suggestion at trial that Plaintiffs filed this lawsuit

---

[8] Without converting the instant opinion into one for summary judgment, the Court is of the view that this issue is far from "clear and unequivocal," as Defendants assert, based on a review of record. (ECF No. 166-7.)

for the purpose of financial gain; (5) evidence of Uzcha's marital or parental status; (6) opinion evidence by lay witnesses; (7) Defendants from raising the "Affirmative Defense of Failure to Mitigate"; (8) Defendants from offering an "Empty Chair" defense; (9) testimony concerning Plaintiffs' citizenship; (10) testimony concerning any prior convictions, arrests, and charges of Plaintiffs, if any; and (11) statements by Defendants indicating that there were "no prior accidents."

This motion exemplifies petulance. The Court would like to advise Plaintiffs' counsel of a basic principle of our system of evidence: irrelevant evidence is not admissible. Fed. R. Evid. 402. In addition, petulant motions, in Plaintiffs' counsel's own words, "degrades the American legal process and the principles of justice and equity." (Pl. Omnibus Mem. ¶ 18, ECF No. 167.) This motion is decided as follows:

With respect to the apology, Defendants shall not apologize to the jury for Plaintiffs' injuries. Yet the Court will not preclude Defendants from suggesting that "no party wishes an accident to happen, or that someone would be injured." (ECF No. 170.)

Plaintiffs' financial status is precluded for the same reason as that of Defendants, which has been discussed in Section II-A of this opinion.

The statement "anyone can file a lawsuit" is precluded as irrelevant.

The Court declines to set a categorical preclusion on statements to the effect that Plaintiffs filed this lawsuit for the purpose of financial gain at this time. Similarly, the Court will not categorically preclude evidence of Plaintiffs' marital status, parental status, citizenship, collateral source payments,[10] prior convictions, arrests, and charges. Such evidence that is relevant to

---

[10] The Court reminds Defendants that "[t]he burden is on the defendant to prove that a plaintiff's award should be reduced by payments received from collateral sources." *LaMarca v. United States*, 31 F. Supp. 2d 110, 132 (E.D.N.Y. 1998) (citing *Damiano v. Exide Corp.*, 970 F.Supp. 222, 229 (S.D.N.Y.1997)).

liability or damages may be admitted, and unduly prejudicial testimony will be stricken. Fed. R. Evid. 404(b).

With respect to "opinion evidence by lay witnesses," Plaintiffs seek to limit the testimony of Winston Ash ("Mr. Ash") and Brian Kelly ("Mr. Kelly") about the activities of employees of American Paper. Mr. Ash was Uzhca's direct supervisor when the May 2015 accident took place. Mr. Kelly was the driver who dropped off the empty trailer and picked up the loaded trailer on the day of the accident. Mr. Ash and Mr. Kelly are slated to introduce testimony, based upon their personal perceptions and experience, regarding their job responsibilities as employees of American Paper. Such evidence, if in the form of an opinion, will be admitted as long as it is rationally based on the witnesses' personal knowledge and "helpful to a clear understanding of the witness's testimony." *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 423, 427 (S.D.N.Y. 2000) (citing Fed. R. Evid. 701; *United States v.* Rea, 958 F.2d 1206, 1215 (2d Cir.1992)). At this time, the Court sees no basis to limit Mr. Ash and Mr. Kelly's testimony. Plaintiffs may renew their motion to preclude during trial if Mr. Ash or Mr. Kelly improperly proffers opinion testimony based on specialized knowledge within the scope of Fed. R. Evid. 702.

With respect to the affirmative defense of failure to mitigate, Plaintiffs chiefly contend that Defendants are required by law to prove failure to mitigate through expert testimony, and that Defendants fail to proffer such expert witnesses. Plaintiffs misstate the law. While the burden indeed falls on Defendants to prove failure to mitigate, *see, e.g., LaMarca v. United States*, 31 F. Supp. 2d 110, 131 (E.D.N.Y. 1998), there is no requirement that the proof must be provided through expert testimony. As such, Defendants are permitted to raise the affirmative defense of failure to mitigate.

With respect to the "Empty Chair" defense, Plaintiffs appear to assert that Defendants should not be permitted to attribute liability to American Paper, a nonparty. For the same reason stated in Section II-C, the Court declines to preclude Defendants from invoking such trial tactics.

Lastly, Plaintiffs provide no persuasive bases for the Court to preclude evidence of the absence of prior accidents, which is "generally admissible on the issues of notice and foreseeability." *Melini v. 71st Lexington Corp.*, No. 7 Civ. 701 (JCF), 2009 WL 1905032, at *4 (S.D.N.Y. July 2, 2009) (citing *McDonough v. Celebrity Cruises, Inc.*, 64 F.Supp.2d 259, 265 (S.D.N.Y.1999); *Orlick v. Granit Hotel and Country Club,* 30 N.Y.2d 246, 248–50 (1972)). Accordingly, such evidence will be admitted if relevant, unless the Court determines, during trial, that the proffer evidence is unduly prejudicial under Fed. R. Evid. 404(b).

Accordingly, the Court grants Plaintiffs' omnibus motion *only to the extent expressly set forth above*.

## V.   Christopher Ferrone (ECF No. 168)

Christopher Ferrone ("Mr. Ferrone"), Defendants' expert witness, is expected to testify in person that (1) "the ISRI guideline found on the internet by Plaintiffs' expert is not a recognized industry standard and it was the responsibility of American Paper, the carrier, not [Sam's East], the shipper, to ensure the safety of the load"; and (2) "the *Savage* rule[11] applies here and that the standard is an objective, not a subjective one." (Parties' Joint Pretrial Order at 11, ECF No. 163.)

Plaintiffs seek to preclude Mr. Ferrone on the following four bases: alleged failure to fully comply with the requirements of Fed. R. Civ. P. 26(a)(2)(B) during discovery; lack of

---

[11] The *Savage* rule refers to the Fourth Circuit's holding in *United States v. Savage Truck Line, Inc.* that, while "[t]he primary duty as to the safe loading of property is [ ] upon the carrier, [w]hen the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper." *Uzhca v. Wal-Mart Stores, Inc.*, No. 17-CV-3850 (NSR), 2020 WL 5518591, at *8–9 (S.D.N.Y. Sept. 14, 2020) (citing *Savage Truck Line, Inc*, 209 F.2d 442, 445 (4th Cir. 1953)).

qualifications as an expert witness on loading, placing, and securing cargo; lack of qualification as an accident reconstructionist; and lack of proper methodology.

Plaintiffs further seek to limit Mr. Ferrone's testimony in two aspects, averring that: first, Mr. Ferrone is not permitted to testify to the meaning, intent, applicability, and the alleged non-delegable nature of regulations prescribed by the Federal Motor Carrier Safety Administration (FMCSA), a federal agency of the Department of Transportation (DOT); and second, Mr. Ferrone is not permitted to opine on other witnesses' credibility. The Court address each of Plaintiffs' arguments in turn.

With respect to the Fed. R. Civ. P. 26(a)(2)(B) requirements, this Court had made abundantly clear—in multiple pretrial conferences—that all discovery issues must be resolved before the presiding Magistrate Judge. Discovery is now closed. As such, the Court will not entertain the instant motion on the basis of Fed. R. Civ. P. 26(a)(2)(B).

With respect to Mr. Ferrone's qualifications as an expert witness, the Court, having reviewed Mr. Ferrone's CV (ECF No. 168-C), concludes that Mr. Ferrone "qualifie[s] as an expert by knowledge, skill, experience, training, or education" for his proposed testimony regarding the ISRI guideline. Fed. R. Evid. 702. Mr. Ferrone has decades of industry experience involving heavy trucks, which includes the scrap recycling industries. Mr. Ferrone's extensive knowledge of industry practice may "assist the trier of fact" in weighing the ISRI guideline and its acceptance by the industry. Fed. R. Evid. 702. A specialized focus of expertise on "loading, placing, and securing cargo," as Plaintiffs assert, is not necessary.

The Court is further of the view that Mr. Ferrone is qualified as an expert on accident reconstruction, as Mr. Ferrone's CV indicates a substantial number of publications[12] and professional presentations[13] on accident reconstruction.  It is undisputed, however, that Mr. Ferrone did not conduct a reconstruction of Uzhca's May 2015 accident. As such, Mr. Ferrone is not permitted to base any of his testimony regarding the underlying accident on or in relation to accident reconstruction. *Cf*. Fed. R. Evid. 702.; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (holding that the proposed expert testimony must be based "on a reliable foundation" grounded on "sufficient facts or data").

With respect to the FMCSA regulations, the Court agrees that "an expert should not be permitted to express an opinion that is merely an interpretation of federal statutes or regulations, as that is the sole province of the Court." *DeGregorio v. Metro-N. R. Co.*, No. 5 Civ. 533 (JGM), 2006 WL 3462554, at *3 (D. Conn. Nov. 1, 2006) (citing *United States v. Scop*, 846 F.2d 135, 140–42 (2d Cir.1988)). Thus, Mr. Ferrone is not permitted to testify to the meaning, intent, or applicability of any FMCSA regulations or other federal regulations. Mr. Ferrone is also not permitted to testify on the applicability of the *Savage* rule.  Mr. Ferrone is further not permitted to offer his opinion on whether such regulations are delegable.  In addition, Mr. Ferrone may not state to the jury, in any form, whether a regulation was violated.  However, while Mr. Ferrone is not allowed to draw any legal conclusions in his testimony, he is permitted to reference the relevant federal regulations if his testimony is based on such regulations in addition to his industry experience.

---

[12] See, for example, Goebelbeacker, J.M., Ferrone, C.W., "Utilizing Electronic Control Module Data in Accident Reconstruction," S.A.E. Paper 2000-01-0466, March, 2000; "Accident Reconstruction: Analysis, Simulation and Visualization." (SP-1491). (Ferrone's CV at 16, ECF No. 168, Exhibit C.) *See also* Ferrone's CV at 21, ¶ 99.
[13] See, for example, Ferrone's CV at 30, ¶ 27a; at 31, ¶ 45a; at 33, ¶ 67-68; at 34, ¶ 78; at 35, ¶ 87; at 36, ¶ 96.

With respect to Mr. Ferrone's testimony "criticizing other witnesses' credibility" (ECF No. 168), Plaintiffs are referring to Mr. Ferrone's statements regarding one of Plaintiffs' witnesses' knowledge of the FMCSA rules. Specifically, Plaintiffs' counsel and Mr. Ferrone made the following statements in an apparently heated exchange during deposition:

Q:  Okay. So the bottom line is you can't be a little pregnant. It's one or the other. Either [Mr. Walter Caminade[14], in his former capacity as one of Sam's Club employees] can walk away knowing it's not – that they loaded it, placed it and it's not properly secured and that could unnecessarily harm someone and they could walk away or not. Which is it?

A:  The reason that I can't answer that is it's a nonanswerable –

Q:  If you can't, just say you can't answer it. I don't need to know the reason. You can't answer it, you can't answer it. That's all I need to know.

A:  I am not done yet.

Q:  That's it. Either you agree, you disagree or you can't answer it. Those are the possibilities.

A:  **There's a third possibility. Your question is incomplete. That assumes that they don't realize that the next step is securement. They are sophisticated shippers. They know that the next step after placement and loading and whatever terms you use, they are aware as sophisticated shippers that the next step out of the three that you love**

---

[14] According to the parties' joint pretrial order, Mr. Walter Caminade, a former employee of Sam's Club, is expected to testify "as to the duties of Defendants to ensure that the bales of recycled cardboard were properly loaded, placed, and secured; that Defendants packed trailers to the ceiling in order to maximize their profits; that Defendants herein failed to comply with their own good and accepted practices/standards of care, proximately causing this incident." (ECF No. 163.)

> **to wave your fingers at me the next step is securement. They also know**
>
> **that that's the motor carrier's responsibility.**
>
> Q:   So you are reading their state of mind there. You are entering their state
>
> of mind. Is that what you are doing?
>
> **A:   Let me just tell you how this works.**
>
> Q:   No, I don't need to know how it works. The way it works is ask
>
> questions. You answer my questions instead of giving the speeches you
>
> want to give. That's the way it works. I move to strike that again.

(Ferrone Tr. at 225-227.) The parley speaks for itself.

This part of the motion is resolved as follows: During trial, Mr. Ferrone is permitted to testify to the industry practice based on his knowledge and experience, or, stated differently, how things work. Mr. Ferrone is not permitted to speculate as to other witnesses' state of mind. Plaintiffs' counsel is strongly encouraged to deliver his questions in a civil and courteous manner.

Accordingly, the Court grants Plaintiffs' motion to limit Mr. Ferrone's testimony *only to the extent expressly set forth above*. Plaintiffs' request for a *Daubert* hearing is denied.

## VI.  Dr. Scott V. Haig (ECF No. 169)

Scott V. Haig, M.D. ("Dr. Haig"), Defendants' expert witness, is expected to testify that (1) only Uzhca's right ankle fracture is causally related to the May 2015 accident; and (2) Uzcha "refused active ranges of motion" when examined by Dr. Haig on March 21, 2019. (ECF No. 163.)

Plaintiffs move to limit Dr. Haig's testimony. A painstaking review of Plaintiffs' liberally written and loosely organized briefs reveals a principal grievance that Dr. Haig is allegedly biased against Uzcha, questioning his "motivation" and referring to him as a "malingerer." (Pl. Mem. at 3, ECF No. 169.)

This motion is resolved as follows: Dr. Haig is not permitted to state that Uzhca was "malingering" or that Uzhca was a "malingerer." Dr. Haig is also not permitted to testify to Uzhca's state of mind. However, Dr. Haig is permitted to testify to any factual occurrence based on his personal observation. Specifically, Dr. Haig is permitted to give testimony regarding any movements that Uzhca made, as well as those that Uzcha refused to make, during the physical examination at issue. Dr. Haig is further permitted, as an orthopedic surgeon and a qualified expert witness, to give opinion testimony within a reasonable degree of medical certainty, as to whether his examination of Uzcha revealed inconsistencies between Uzhca's subjective reports of symptoms and the objective impairment as determined by Dr. Haig.

Accordingly, the Court grants Plaintiffs' motion to limit Dr. Haig's testimony *only to the extent expressly set forth above*. Plaintiffs' request for a *Daubert* hearing is denied.

## VII.   Plaintiffs' Post-2019 Medical Record (ECF No. 195)

This motion arises from Uzhca's astonishing disclosure of his April 2022 accident during the September 16, 2022 pretrial conference. Defendants presently moved under Fed. R. Civ. P. 37 ("Rule 37"), seeking: (1) to preclude Dr. Radna from offering any testimony at the time of trial with respect to facts and opinions presented in his August 15, 2022 Supplemental Report[15]; (2) to preclude Uzcha from claiming that he cannot work as a delivery driver based on Dr. Radna's recent examination; (3) to preclude any of the diagnostic films mentioned or reviewed in Dr. Radna's Supplemental Report including, but not limited to the serial stereo-3D sagittal views of the cervical spine taken on March 19, 2019; (4) to preclude the most recent office clinic note of Dr. Daniel Zelazny or any testimony from Dr. Zelazny or others regarding its contents; (5) to preclude Uzcha's physician, Dr. Darren Friedman, from offering any testimony at the time of trial with

---

[15] Defendants submit that such testimony includes, but is not limited to, Dr. Radna's opinion regarding his recent examination of Uzcha and his opinions regarding causation of Uzcha's injuries.

respect to facts and opinions presented in his "updated Narrative Report;" (6) to preclude Dr. Darren Friedman's notes of August 4, 2022 and September 1, 2022 or any testimony from Dr. Friedman or others regarding their contents; (7) to preclude the "updated Narrative Report" of Dr. Landis Barnes; (8) to preclude the August 3, 2022 and August 31, 2022 notes of Dr. Landis Barnes or any testimony from Dr. Barnes or others regarding its contents; and (9) reasonable expenses incurred by Defendants in making the instant motion, including attorneys' fees.

Plaintiffs submit that "[i]f Defendants wish that Plaintiff not testify or introduce evidence concerning the recent incident, Plaintiff is [sic] consents, as there is nothing to discuss." (Pl. Opp. ¶ 8, ECF No. 198.) Nonetheless, Plaintiffs object to the preclusion of Dr. Radna's 2019 report, which Plaintiffs argue was first served in 2019, and was then "re-served prophylactically in 2022." (*Id*. ¶ 9.)

Rule 37(b)(2) provides that when a party "fails to obey an order to provide or permit discovery,  the court . . . may issue further just orders," which include "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence"; "striking pleadings in whole or in part"; or "rendering a default judgment against the disobedient party[.]" Fed. R. Civ. P. 37(b)(2)(A).  The Court has "wide discretion in imposing sanctions under Rule 37[.]" *S.E. New England Tel. Co. v. Global NAPs, Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) (internal quotation and citation omitted). The Court considers the following factors when exercising its discretion to impose sanctions: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) (internal quotation and citation omitted). In addition, "the court must order the

disobedient party ... to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified, or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C); *see also* Fed. R. Civ. P. 16(f)(2).

This motion is resolved as follows:

Any materials produced or served by Plaintiffs after August 1, 2022—in blatant violation of this Court's order during the January 6, 2022 conference—is strictly precluded. Such precluded materials include all items disclosed in Plaintiffs' September 6, 2022 and September 19, 2022 communications with Defendants.

Regarding Dr. Radna's report, only the version based on his examination of Uzhca on March 18, 2019 is admissible. The "supplemental" version that was "prophylactically re-served" in 2022 is strictly precluded. In addition, Dr. Radna is not permitted to offer any testimony with respect to any examination of Uzcha, or any review of Uzcha's medical record, after March 18, 2019. Any testimony concerning Dr. Radna's examination of Uzcha on August 15, 2022 is inadmissible. With respect to the diagnostic films mentioned or reviewed in Dr. Radna's August 15, 2022 report, which include the serial stereo-3D sagittal views of the cervical spine taken on March 19, 2019, such materials are admissible only to the extent that they were already mentioned or reviewed in Dr. Radna's March 2019 report.

The Court further grants the following reliefs without objection from Plaintiffs:

Dr. Daniel Zelazny's notes based on his August 11, 2022 examination of Uzcha are precluded. Any testimony from Dr. Zelazny or others regarding the contents of such notes is also precluded.

Dr. Darren Friedman is precluded from offering any testimony concerning facts and opinions presented in his "updated Narrative Report" based on his August 2022 examination of Uzcha.

Dr. Darren Friedman's notes of his examination of Uzcha on August 4, 2022 and September 1, 2022 are precluded. Any testimony from Dr. Friedman or others regarding the contents of such notes is also precluded.

Dr. Landis Barnes, whom Uzcha first saw on August 3, 2022, is precluded from testifying at this trial. Any medical record produced by Dr. Barnes is also precluded.

Uzcha is not permitted to claim that he cannot work as a delivery driver if such claims are based on Dr. Radna's examination of Uzcha any time after March 2019. Defendants are permitted to introduce evidence that Uzcha was driving when he was involved in a vehicle collision in April 2022.

Accordingly, the Court grants Defendants' motion to the extent set forth above. Defendants' request for expenses and fees is denied.

## CONCLUSION

For the foregoing reasons, the Court resolves the parties' motions as follows:

(1) Defendants' motion at ECF No. 164 is DENIED;

(2) Defendants' motion at ECF No. 165 is GRANTED IN PART, DENIED IN PART;

(3) Defendants' motion at ECF No. 166 is DENIED;

(4) Plaintiffs' motion at ECF No. 167 is GRANTED IN PART, DENIED IN PART;

(5) Plaintiffs' motion at ECF No. 168 is GRANTED IN PART, DENIED IN PART;

(6) Plaintiffs' motion at ECF No. 169 is GRANTED IN PART, DENIED IN PART; and

(7) Defendants' motion at ECF No. 195 is GRANTED IN PART, DENIED IN PART.

The parties are directed to appear in person before this Court for a pretrial conference on May 3, 2023 at 11:00AM.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 164, 165, 166, 167, 168, 169, and 195.

Dated:   March 15, 2023                                   SO ORDERED:
         White Plains, New York


                                                          NELSON S. ROMÁN
                                                          United States District Judge